TEHAN, SHERIFF, *v.* UNITED STATES, EX REL. SHOTT.

[Cite as Tehan, Sheriff, v. United States, ex rel. Shott, 8 Ohio Misc. 81.*]

(No. 52—Decided January 19, 1966.)

ON WRIT OF CERTIORARI: United States Supreme Court.

*Mr. Calvin W. Prem,* for petitioner.
*Mr. Thurman Arnold,* for respondent.

Mr. Justice STEWART delivered the opinion of the Court.

In 1964 the court held that the Fifth Amendment's privilege against compulsory self-incrimination "is also protected by the Fourteenth Amendment against abridgment by the States." *Malloy* v. *Hogan,* 378 U. S. 1, 6, 12 L. Ed. 2d 653. In *Griffin* v. *California,* decided on April 28, 1965, the court held that adverse

———
*382 U. S. 406, 15 L. Ed. 2d 453, vacating judgment in 3 Ohio Misc. 130, 337 F. 2d 990.

comment by a prosecutor or trial judge upon a defendant's failure to testify in a state criminal trial violates the federal privilege against compulsory self-incrimination, because such comment "cuts down on the privilege by making its assertion costly." 380 U. S. 609, 614, 14 L. Ed. 2d 106. The question before us now is whether the rule of *Griffin* v. *California* is to be given retrospective application.

In the summer of 1961 the respondent was brought to trial before a jury in an Ohio court upon an indictment charging violations of the Ohio Securities Act.[1] The respondent did not testify in his own behalf, and the prosecuting attorney in his summation to the jury commented extensively upon that fact.[2] The jury found the respondent guilty, the judgment of conviction was affirmed by an Ohio court of appeals, and the Supreme Court of Ohio declined further review. *State* v. *Shott*, 173 Ohio St. 542. The respondent then brought his case to this court, claiming several constitutional errors but not attacking the Ohio comment rule as such. On May 13, 1963, we dismissed the appeal and denied certiorari, Mr. Justice Black dissenting. *Shott* v. *Ohio*, 373 U. S. 240, 10 L. Ed. 2d 409. No petition for rehearing was filed. All avenues of direct review of the respondent's conviction were thus fully foreclosed more than a year before our decision in *Malloy* v. *Hogan, supra,* and almost two years before our decision in *Griffin* v. *California, supra.*

A few weeks after our denial of certiorari the respondent sought a writ of habeas corpus in the United States District Court for the Southern District of Ohio, again alleging various constitutional violations at his state trial, but again not attacking the Ohio comment rule as such. The District Court dismissed the writ, and the respondent appealed to the United States Court of Appeals for the Sixth Circuit. On November 10, 1964, the court reversed, noting that "the day before the oral argument of this appeal, the Supreme Court in *Malloy* v. *Hogan*

---

[1] Sections 1707.01-1707.45, Revised Code.

[2] Since 1912 a provision of the Ohio Constitution has permitted a prosecutor to comment upon a defendant's failure to testify in a criminal trial. Article I, Section 10 of the Constitution of Ohio provides, in part, as follows: "No person shall be compelled, in any criminal case, to be a witness against himself; but his failure to testify may be considered by the court and jury and may be made the subject of comment by counsel."

Section 2945.43, Revised Code, contains substantially the same wording.

* * * reconsidered its previous rulings and held that the Fifth Amendment's exception from self-incrimination is also protected by the Fourteenth Amendment against abridgment by the states,'' and reasoning that ''the protection against self-incrimination under the Fifth Amendment includes not only the right to refuse to answer incriminating questions, but also the right that such refusal shall not be commented upon by counsel for the prosecution.'' 337 F. 2d 990, 992.

We granted certiorari, requesting the parties ''to brief and argue the question of the retroactivity of the doctrine announced in *Griffin* v. *California* * * *,'' *supra.* Since, as we have noted the original Ohio judgment of conviction in this case became final long before *Griffin* v. *California* was decided by this court, that question is squarely presented.[3]

In *Linkletter* v. *Walker,* 381 U. S. 618, 14 L. Ed. 2d 601, we held that the exclusionary rule of *Mapp* v. *Ohio,* 367 U. S. 643, 86 Ohio Law Abs. 513, 6 L. Ed. 2d 1081, was not to be given retroactive effect. The *Linkletter* opinion reviewed in some detail the competing conceptual and jurisprudential theories bearing on the problem of whether a judicial decision that overturns previously established law is to be given retroactive or only prospective application. Mr. Justice Clark's opinion for the court outlined the history and theory of the problem in terms both of the views of the commentators and of the decisions in this and other courts which have reflected those views. It would be a

---

[3]The Supreme Court of California and the Supreme Court of Ohio have both considered the question, and each court has unanimously held that under the controlling principles discussed in *Linkletter* v. *Walker,* 381 U. S. 618, 14 L. Ed. 2d 601, the *Griffin* rule is not to be applied retroactively in those states. *In re Gaines,* Cal., 45 Cal. Rptr. 865, 404 P. 2d 473; *Pinch* v. *Maxwell,* 3 Ohio St. 2d 212.

As in *Linkletter,* the question in the present case is not one of ''pure prospectivity.'' The rule announced in *Griffin* was applied to reverse Griffin's conviction. Compare *England* v. *Louisiana State Board of Medical Examiners,* 375 U. S. 411, 11 L. Ed. 2d 440. Nor is there any question of the applicability of the Griffin rule to cases still pending on direct review at the time it was announced. Cf. *O'Connor* v. *Ohio,* 382 U. S. 286, 15 L. Ed. 2d 337. December 13, 1965.

The precise question is whether the rule of *Griffin* v. *California* is to be applied to cases in which the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari elapsed or a petition for certiorari finally denied, all before April 28, 1965.

needless exercise here to survey again a field so recently and thoroughly explored.[4]

Rather, we take as our starting point *Linkletter's* conclusion that "the accepted rule today is that in appropriate cases the court may in the interest of justice make the rule prospective," that there is "no impediment—constitutional or philosophical—to the use of the same rule in the constitutional area where the exigencies of the situation require such an application," in short that "the Constitution neither prohibits nor requires retrospective effect." Upon that premise, resolution of the issue requires us to "weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." 381 U. S., at 628-629.[5]

*Twining* v. *New Jersey* was decided in 1908. 211 U. S. 78, 53 L. Ed. 97. In that case the plaintiffs in error had been convicted by the New Jersey courts after a trial in which the judge had instructed the jury that it might draw an adverse inference from the defendants' failure to testify. The plaintiffs in error urged in this court two propositions: "[f]irst, that the exemption from compulsory self-incrimination is guaranteed by the Federal Constitution against impairment by the states; and, second, if it be so guaranteed, that the exemption was in fact impaired in the case at bar." 211 U. S., at 91. In a lengthy opinion which thoroughly considered both the Privileges and Immunities Clause and the Due Process Clause of the Fourteenth Amendment, the court held, explicitly and unambiguously, "that the exemption from compulsory self-incrimination in the courts of the states is not secured by any part of the Federal Constitution." 211 U. S., at 114. Having thus rejected the first proposition advanced by the plaintiffs in error, the court refrained from passing on the second. That is, the court did not decide whether adverse comment upon a defendant's failure to testify constitutes a violation of the federal constitutional right against self-incrimination.[6]

---

[4]See *Linkletter* v. *Walker*, 381 U. S. 618, 622-628, 14 L. Ed. 2d 601.

[5]For a recent commentary on the *Linkletter* decision and a suggested alternative approach to the problem, see Mishkin, The Supreme Court 1964 Term—Foreword: The High Court, The Great Writ, and the Due Process of Time and Law, 79 Harv. L. Rev. 56.

[6]"We have assumed only for the purpose of discussion that what was

The rule thus established in the *Twining case* was reaffirmed many times through the ensuing years. In an opinion for the court in 1934, Mr. Justice Cardozo cited *Twining* for the proposition that "[t]he privilege against self-incrimination may be withdrawn and the accused put upon the stand as a witness for the state." *Snyder* v. *Massachusetts,* 291 U. S. 97, 105, 78 L. Ed. 674, 90 A. L. R. 575. Two years later Chief Justice Hughes, writing for a unanimous court, reiterated the explicit statements of the rule in *Twining* and *Snyder,* noting that "[t]he compulsion to which the quoted statements refer is that of the processes of justice by which the accused may be called as a witness and required to testify." *Brown* v. *Mississippi,* 297 U. S. 278, 285, 80 L. Ed. 682. In 1937 the court again approved the *Twining* doctrine in *Palko* v. *Connecticut,* 302 U. S. 319, 324, 325-326, 82 L. Ed. 288. In *Adamson* v. *California,* 332 U. S. 46, 91 L. Ed. 1903, 171 A. L. R. 1233, the issue was once more presented to the court in much the same form as it had been presented almost 40 years earlier in *Twining*. In *Adamson* there had been comment by judge and prosecutor upon the defendant's failure to testify at his trial, as permitted by the California Constitution. The court again followed *Twining* in holding that the Fourteenth Amendment does not require a state to accord the privilege against self-incrimination, and, as in *Twining,* the court did not reach the question whether adverse comment upon a defendant's failure to testify would violate the Fifth Amendment privilege.[7] Thereafter the court continued to adhere to the *Twining* rule, notably in *Knapp* v. *Schweitzer,* decided in 1958, 357 U. S. 371,

----

done in the case at bar was an infringement of the privilege against self-incrimination. We do not intend, however, to lend any countenance to the truth of that assumption. The courts of New Jersey, in adopting the rule of law which is complained of here, have deemed it consistent with the privilege itself, and not a denial of it. * * * The authorities upon the question are in conflict. We do not pass upon the conflict, because, for the reasons given, we think that the exemption from compulsory self-incrimination in the courts of the states is not secured by any part of the Federal Constitution." 211 U. S., at 114, 29 S. Ct., at 26.

[7] As the court pointed out in *Adamson,* 332 U. S., at 50, n. 6, this question had never arisen in the federal courts, because a federal *statute* had been interpreted as prohibiting adverse comment upon a defendant's failure to testify in a federal criminal trial. See 20 Stat. 30, as amended, now 18 U. S. C. Section 3481; *Bruno* v. *United States,* 308 U. S. 287, 84 L. Ed. 257; *Wilson* v. *United States,* 149 U. S. 60, 37 L. Ed. 650.

374, 2 L. Ed. 2d 1393, and in *Cohen* v. *Hurley,* decided in 1961, 366 U. S. 117, 127-129, 6 L. Ed. 2d 156.

In recapitulation, this brief review clearly demonstrates: (1) For more than half a century, beginning in 1908, the court adhered to the position that the Federal Constitution does not require the states to accord the Fifth Amendment privilege against self-incrimination. (2) Because of this position, the court during that period never reached the question whether the federal guarantee against self-incrimination prohibits adverse comment upon a defendant's failure to testify at his trial.[8] Although there were strong dissenting voices,[9] the court made not the slightest deviation from that position during a period of more than 50 years.

Thus matters stood in 1964, when *Malloy* v. *Hogan* announced that the Fifth Amendment privilege against self-incrimination is protected by the Fourteenth Amendment against abridgment by the states (378 U. S. 6). Less than a year later, on April 28, 1965, *Griffin* v. *California* held that the Fifth Amendment ''in its bearing on the states by reason of the Fourteenth Amendment, forbids * * * comment by the prosecution on the accused's silence * * *.'' (380 U. S., at 615.)

Thus we must reckon here, as in *Linkletter,* 381 U. S., at 636, with decisional history of a kind which Chief Justice Hughes pointed out ''is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration.'' *Chicot County Drainage Dist.* v. *Baxter State Bank,* 308 U. S. 371, 374, 84 L. Ed. 329. It is against this background that we look to the purposes of the *Griffin* rule, the reliance placed upon the *Twining* doctrine, and the effect on the administration of justice of a retrospective application of *Griffin.* See *Linkletter* v. *Walker,* 381 U. S., at 636.

In *Linkletter,* the court stressed that the prime purpose of the rule of *Mapp* v. *Ohio,*[10] rejecting the doctrine of *Wolf* v. *Colorado*[11] as to the admissibility of unconstitutionally seized evi-

---

[8]In the federal judicial system, the matter was controlled by a statute. See n. 7, supra.

[9]See, e. g., Mr. Justice Black's historic dissenting opinion in *Adamson* v. *California,* 332 U. S., at 68.

[10]367 U. S. 643, 6 L. Ed. 2d 1081.

[11]338 U. S. 25, 93 L. Ed. 1782.

dence, was "to deter the lawless action of the police and to effectively enforce the Fourth Amendment." 381 U. S., at 637. There we could "not say that this purpose would be advanced by making the rule retrospective. The misconduct of the police prior to *Mapp* has already occurred and will not be corrected by releasing the prisoners involved." *Ibid.*

No such single and distinct "purpose" can be attributed to *Griffin* v. *California,* holding it constitutionally impermissible for a state to permit comment by a judge or prosecutor upon a defendant's failure to testify in a criminal trial. The *Griffin* opinion reasoned that such comment "is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly." 380 U. S., at 614. It follows that the "purpose" of the *Griffin* rule is to be found in the whole complex of values that the privilege against self-incrimination itself represents, values described in the *Malloy case* as reflecting "recognition that the American system of criminal prosecution is accusatorial, not inquisitorial, and that the Fifth Amendment privilege is its essential mainstay. * * * Governments, state and federal, are thus constitutionally compelled to establish guilt by evidence independently and freely secured, and may not by coercion prove a charge against an accused out of his own mouth.'"[12] 378 U. S., at 7-8.

---

[12]These values were further catalogued in Mr. Justice Goldberg's opinion for the Court in *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 12 L. Ed. 2d 678, announced the same day as *Malloy* v. *Hogan,* 378 U. S. 1, 12 L. Ed. 2d 653; "The privilege against self-incrimination 'registers an important advance in the development of our liberty—"one of the great landmarks in man's struggle to make himself civilized." ' *Ullman* v. *United States,* 350 U. S. 422, 426, 100 L. Ed. 511, 53 A. L. R. 2d 1008. [The quotation is from Griswold, The Fifth Amendment Today (1955), 7.] It reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates 'a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load,' 8 Wigmore, Evidence (McNaughton rev., 1961), 317; our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life,' *United States* v. *Grunewald,* 2 Cir., 233 F. 2d 556, 581-582 (Frank, J., dissenting), rev'd

Insofar as these "purposes" of the Fifth Amendment privilege against compulsory self-incrimination bear on the question before us in the present case, several considerations become immediately apparent. First, the basic purposes that lie behind the privilege against self-incrimination do not relate to protecting the innocent from conviction, but rather to preserving the integrity of a judicial system in which even the guilty are not to be convicted unless the prosecution "shoulder the entire load." Second, since long before *Twining* v. *New Jersey,* all the states have by their own law respected these basic purposes by extending the protection of the testimonial privilege against self-incrimination to every defendant tried in their criminal courts. In *Twining* the court noted that "all the states of the union have, from time to time, with varying form, but uniform meaning, included the privilege in their Constitutions, except the states of New Jersey and Iowa, and in those states it is held to be part of the existing law." 211 U. S., at 92. See also 8 Wigmore, Evidence (McNaughton rev., 1961), Section 2252. It follows that such variations as may have existed among the states in the application of their respective guarantees against self-incrimination during the 57 years between *Twining* and *Griffin* did not go to the basic purposes of the federal privilege. And finally, insofar as strict application of the federal privilege against self-incrimination reflects the Constitution's concern for the essential values represented by "our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life,' "[13]

353 U. S. 391, 1 L. Ed. 2d 931, 62 A. L. R. 2d 1344; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a shelter to the guilty,' is often 'a protection to the innocent.' *Quinn* v. *United States,* 349 U. S. 155, 162, 99 L. Ed. 964, 51 A. L. R. 2d 1157." 378 U. S. at 55. "[T]he privilege against self-incrimination represents many fundamental values and aspirations. It is 'an expression of the moral striving of the community. * * * a reflection of our common conscience * * *.' *Malloy* v. *Hogan,* 378 U. S. 9, n. 7, quoting Griswold, The Fifth Amendment Today (1955), 73. That is why it is regarded as so fundamental a part of our constitutional fabric, despite the fact that 'the law and the lawyers * * * have never made up their minds just what it is supposed to do or just whom it is intended to protect.' Kalven, Invoking the Fifth Amendment—Some Legal and Impractical Considerations, 9 Bull. Atomic sci. 181, 182." 378 U. S., at 56, n. 5.

[13]See n. 12, supra.

any impingement upon those values resulting from a state's application of a variant from the federal standard cannot now be remedied. As we pointed out in *Linkletter* with respect to the Fourth Amendment rights there in question, "the ruptured privacy * * * cannot be restored." 381 U. S., at 637.

As in *Mapp,* therefore, we deal here with a doctrine which rests on considerations of quite a different order from those underlying other recent constitutional decisions which have been applied retroactively. The basic purpose of a trial is the determination of truth, and it is self-evident that to deny a lawyer's help through the technical intricacies of a criminal trial or to deny a full opportunity to appeal a conviction because the accused is poor is to impede that purpose and to infect a criminal proceeding with the clear danger of convicting the innocent. See *Gideon* v. *Wainwright,* 372 U. S. 335, 9 L. Ed. 2d 799; *Doughty* v. *Maxwell,* 376 U. S. 202, 11 L. Ed. 2d 650; *Griffin* v. *Illinois,* 351 U. S. 12, 100 L. Ed. 891; *Eskridge* v. *Washington Prison Board,* 357 U. S. 214, 2 L. Ed. 2d 1269. The same can surely be said of the wrongful use of a coerced confession. See *Jackson* v. *Denno,* 378 U. S. 368, 12 L. Ed. 2d 908, 1 A. L. R. 3d 1205; *McNerlin* v. *Denno,* 378 U. S. 368, 12 L. Ed. 2d 1041; *Reck* v. *Pate,* 367 U. S. 433, 6 L. Ed. 2d 948. By contrast, the Fifth Amendment's privilege against self-incrimination is not an adjunct to the ascertainment of truth. That privilege, like the guarantees of the Fourth Amendment, stands as a protection of quite different constitutional values—values reflecting the concern of our society for the right of each individual to be let alone. To recognize this is no more than to accord those values undiluted respect.

There can be no doubt of the states' reliance upon the *Twining* rule for more than a half century, nor can it be doubted that they relied upon that constitutional doctrine in the utmost good faith. Two states amended their constitutions so as expressly to permit comment upon a defendant's failure to testify, Ohio in 1912,[14] and California in 1934.[15] At least four other states followed some variant of the rule permitting comment.[16]

---

[14]See n. 2, supra.

[15]California Constitution, Art. I, Section 13.

[16]See *State* v. *Heno,* 119 Conn. 29, 174 A. 181, 94 A. L. R. 696; *State* v. *Ferguson,* 226 Iowa 361, 372-373, 283 N. W. 917, 923; *State* v. *Corby,* 28 N. J. 106, 145 A. 2d 289; *State* v. *Sandoval,* 59 N. M. 85, 279 P. 2d 850.

Moreover, this reliance was not only invited over a much longer period of time, during which the *Twining* doctrine was repeatedly reaffirmed in this court, but was of unquestioned legitimacy as compared to the reliance of the states upon the doctrine of *Wolf* v. *Colorado*, considered in *Linkletter* as an important factor militating against the retroactive application of *Mapp*. During the 11-year period between *Wolf* v. *Colorado* and *Mapp* v. *Ohio*, the states were aware that illegal seizure of evidence by state officers violated the Federal Constitution.[17] In the 56 years that elapsed from *Twining* to *Malloy*, by contrast, the states were repeatedly told that comment upon the failure of an accused to testify in a state criminal trial in no way violated the Federal Constitution.[18]

The last important factor considered by the court in *Linkletter* was "the effect on the administration of justice of a retrospective application of *Mapp*." 381 U. S. at 636. A retrospective application of *Griffin* v. *California* would increase stresses upon the administration of justice more concentrated but fully as great as would have been created by a retrospective application of *Mapp*. A retrospective application of *Mapp* would have had an impact only in those states which had not themselves adopted the exclusionary rule, apparently some 24 in number.[19] A restrospective application of *Griffin* would have an impact only upon those states which have not themselves adopted the no comment rule, apparently six in number.[20] But upon those six states the impact would be very grave indeed. It is not in every criminal trial that tangible evidence of a kind that might raise *Mapp* issues is offered. But it may fairly be assumed that there

---

[17]In *Wolf* v. *People of State of Colorado*, 338 U. S. 25, 93 L. Ed. 1782, it was unequivocally determined by a unanimous court that the Federal Constitution, by virtue of the Fourteenth Amendment, prohibits unreasonable searches and seizures by state officers. "The security of one's privacy against arbitrary intrusion by the police * * * is * * * implicit in 'the concept of ordered liberty' and as such enforceable against the states through the Due Process Clause." 338 U. S., at 27-28.

[18]See, for example, *Scott* v. *California*, 364 U. S. 471, 5 L. Ed. 2d 222, where, as late as December 1960, only a single member of the court expressed dissent from the dismissal of an appeal challenging the constitutionality of the California comment rule.

[19]See *Elkins* v. *United States*, 364 U. S. 206, at 224-225, 4 L. Ed. 2d 1669 (Appendix).

[20]See notes 2, 15, and 16, *supra*.

has been comment in every single trial in the courts of California, Connecticut, Iowa, New Jersey, New Mexico, and Ohio, in which the defendant did not take the witness stand—in accordance with state law and with the United States Constitution as explicitly interpreted by this court for 57 years.

Empiracal statistics are not available, but experience suggests that California is not indulging in hyperbole when in its *amicus curiae* brief in this case it tells us that "Prior to this court's decision in *Griffin*, literally thousands of cases were tried in California in which comment was made upon the failure of the accused to take the stand. Those reaping the greatest benefit from a rule compelling retroactive application of *Griffin* would be [those] under lengthy sentences imposed many years before *Griffin*. Their cases would offer the least likelihood of a successful retrial since in many, if not most, instances, witnesses and evidence are no longer available." There is nothing to suggest that what would be true in California would not also be true in Connecticut, Iowa, New Jersey, New Mexico, and Ohio. To require all of those states now to void the conviction of every person who did not testify at his trial would have an impact upon the administration of their criminal law so devastating as to need no elaboration.

We have proceeded upon the premise that "we are neither required to apply, nor prohibited from applying a decision retrospectively." *Linkletter* v. *Walker,* 381 U. S. at 629. We have considered the purposes of the *Griffin* rule, the reliance placed upon the *Twining* doctrine, and the effect upon the administration of justice of a retrospective application of *Griffin*. After full consideration of all of the factors, we are not able to say that the *Griffin* rule requires retrospective application.

The judgment is vacated and the case remanded to the Court of Appeals for the Sixth Circuit for consideration of the claims contained in the respondent's petition for habeas corpus, claims which that court has never considered. It is so ordered.

*Judgment vacated and case remanded with directions.*

Mr. Justice BLACK, with whom Mr. Justice DOUGLAS joins, dissents for substantially the same reasons stated in his dissenting opinion in *Linkletter* v. *Walker,* 381 U. S. 618, at 640.

The Chief Justice took no part in the decision of this case.

Mr. Justice FORTAS took no part in the consideration or decision of this case.