**UNITED STATES of America ex rel. Frank SMITH**

v.

**Joseph R. BRIERLY, Superintendent.**

**Misc. No. 3460.**

United States District Court
E. D. Pennsylvania.

April 14, 1967.

Robert J. Sugarman, Court-appointed, Philadelphia, Pa., for relator.

Charles A. Haddad, Asst. Dist. Atty., Philadelphia, Pa., for respondents.

OPINION

JOSEPH S. LORD, III, District Judge.

Relator petitions for habeas corpus, alleging, *inter alia*, that he was uncon-

stitutionally prejudiced by the use of "tacit admissions" against him at trial as well as by certain remarks of the trial judge made in the course of the charge. We have concluded that the writ must be granted.

## I.

Relator and two co-conspirators, Young and Collins, were charged with the felony-murder of William Hill, a patron in a tavern which they robbed. In a separate trial at which neither Young nor Collins testified, Smith was found guilty of first degree murder, and on June 28, 1950, he was sentenced to life imprisonment.

The facts surrounding the alleged murder are not directly relevant to our present inquiry. We need only note that one of the material issues of fact at trial was whether the victim, Hill, died as a result of a blow allegedly inflicted on him by one of the co-conspirators. Soon after the robbery, all three men were arrested and subjected to interrogation by the police. The police elicited oral and written statements from Young and Collins, and relator was confronted with these statements on separate occasions. Interestingly enough, the alleged oral statements of the two men, to which the police officers testified on the stand, contained a clearer implication that Smith had struck the victim with a gun than did the written statements. The officers testified that Young's oral statement was that Smith had hit Hill (N.T. 112), and that Collins orally stated that although "he did not actually see Smith hit Mr. Hill, * * * due to his position * * * he knew that he didn't hit him and he knew that Young didn't hit him, so therefore it must have been Smith that hit him" (N.T. 113–114).[1]

However, the subsequent written statements, which were produced and read at trial over defendant's objection, contained disclaimers of any direct knowledge as to who struck Hill or indeed as to whether the victim was hit by anyone. Asked whether he saw who struck Hill, Young said, "I didn't see him, but it had to be Smith because Collins was at the door." (N.T. 102). Collins' reply was a flat " * * * no, I don't know, my back was to the proceedings that was going on." (N.T. 107).

Despite these contradictions, Detective McDermott was allowed to testify that after Smith heard a recital by Young of an oral statement he had earlier given to the police, "Smith did not say anything * * *. He just put his head down like that (indicating) and shook his head like that (indicating). * * * He lowered his head and shook his head from side to side. He tightened his lips and just shook his head like that (indicating). At that time I asked him did he want to ask Young anything at that time, and he did not even answer my question at that time." (N.T. 112–113). Relator's trial counsel realized that since the court had refused to sustain his objection, the next best thing would be to have the evidence construed as a firm denial of Young's statement. He asked "that the stenographer note that the head was shaken from side to side with his lips clenched." (N.T. 113). But the trial judge responded otherwise to the evidence he had admitted: "The indication I got was not as a 'no' but as a consternation. I want that noted, too." (N.T. 113).

Detective McDermott then testified that he next questioned Collins privately, obtained an oral statement implicating Smith in the death blow, and had Collins repeat the substance of the statement to Smith. "At that time [Smith] did not answer, he did not show any signs, he did not say anything." (N.T. 114).

Another police officer, Detective McGurk, testified that when Smith was confronted with the subsequent written statements of his co-conspirators, the relator again said nothing. (N.T. 94–95). These statements were then read into evidence. Detective Jones later testified that at least at one point, Smith did deny the truth of the statements (N.T. 124–125).

1. "N.T."—Trial transcript.

In addition, the police obtained a written statement from one of the patrons of the tavern, John Riggs, who had supposedly been a witness to the striking incident. The statement identified Smith as the assailant. At the trial, Detective McGurk testified that at the time the statement was taken from Riggs, Smith was present, but "He said nothing. He sat moot [sic] at that time." (N.T. 93).[2]

Thus, there were at least five instances of the use of tacit admissions against relator: the oral statements by Young and Collins, their written statements, and Riggs' statement.

Smith testified in his defense that he had struck no one in the course of the robbery (N.T. 139). He further insisted that when confronted with the statements of Young and Collins, he denied their veracity:

"Well, I shook my head because he said I struck the man, and I shook my head and said 'No, I deny it.'" (N.T. 140). See also N.T. 142, 152–156.

The following colloquy with the court climaxed relator's testimony:

"Q. Did the police question you?

A. Yes.

Q. Did you tell them you had participated in this robbery * * *?

A. No, sir.

Q. Why didn't you tell them?

A. Why didn't I tell them? All they kept saying is,—I struck the man, and I denied that, I didn't strike him, and I wouldn't say nothing until I got some legal advice from my lawyer. That is what I told them." (N.T. 156)

The trial judge in his charge instructed the jury as to the use they might make of the statements by Young and Collins:

"You have a right to consider this: That an innocent man will not stand mute; if he is accused of something that he did not do, he will say, 'No, I did not do it.' One of the detectives said that he shook his head. Now, the impression I got from the way the detective did it—and of course it is not binding on you, and I already told you so—that that gesture of the head may have been consternation of having his buddies squeal on him or tell on him, or it may have been no. But the impression I got from the detective was,—that it seemed to be consternation or surprise that these fellows had told on him. But if you decide that Smith said no, then you cannot consider that testimony, because then Smith made a denial. Where a man makes a denial, then any statement made against him in his presence cannot be considered. If you decide that he did not deny it, but that he stood mute, then you have a right to consider that as an indication of its truth, because otherwise he would have said that wasn't so. * * *" (N.T. 171).

Thus, only if the jury wholly believed Smith were they compelled to disregard the statements. Otherwise, relator's response was admissible as a tacit confession of their accuracy.

## II.

After his conviction, relator did not appeal because "petitioner's parents obtained paid counsel for trial as petitioner was personally indigent and counsel concerned himself generally with conversing with the parents who, along with

---

**2.** At the trial, Riggs himself testified that he did not see Hill get hit (N.T. 59). The prosecution was then permitted to plead surprise and impeach its own witness by use of the written statement, even though it was clear that the District Attorney's office had reason to know that Riggs would repudiate the statement. He had already done so at two pretrial judicial hearings, explaining on each occasion that he was drunk at the time he made the statement. Our disposition of the petition renders moot consideration of possible constitutional issues arising out of the prosecution's use of the statement. See Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967).

petitioner, was never advised or had knowledge of appeal." (Petition, ¶ 10 (a)). We have concluded that there is no evidence which suggests that the failure to appeal constituted a "deliberate by-passing of state procedures", Fay v. Noia, 372 U.S. 391 at p. 439, 83 S.Ct. 822 at p. 849, 9 L.Ed.2d 837 (1963), which would warrant our refusal to entertain the petition.

■ Relator did file a petition for habeas corpus in the Court of Common Pleas of Philadelphia County, the denial of which was affirmed by the Supreme Court of Pennsylvania. Commonwealth ex rel. Smith v. Rundle, 423 Pa. 93, 223 A.2d 88 (1966). Thus, it would seem that the courts of Pennsylvania have had ample opportunity to pass on Smith's contentions, and that the salutary doctrine of comity, see Darr v. Burford, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761 (1950), would not be offended by our own consideration of his petition.

Nonetheless, a question as to whether relator has exhausted all available state remedies was raised at argument before us. It is represented by the District Attorney that although the use of the tacit admissions was considered by the Pennsylvania Supreme Court, its disposition of the petition was founded on only one of the two theories of constitutional error here advanced by relator's counsel. Relator suggests that tacit admissions are constitutionally impermissible *first,* because they are equivalent to involuntary confessions barred by the general terms of the Due Process clause, and *second,* because they violate the specific commands of the Fifth Amendment privilege against self-incrimination. The Pennsylvania Supreme Court sanctioned the use of the tacit admissions in relator's case by reference to its opinion in Commonwealth ex rel. Shadd v. Myers, 423 Pa. 82, 223 A.2d 296 (1966), where it held that the Fifth Amendment privilege prohibiting the use of tacit admissions, see Miranda v. State of Arizona, 384 U.S. 436 at p. 468 n. 37, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Griffin v. State of California, 380 U.S.

609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), does not apply retroactively. See Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); and compare Tehan v. U. S. ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1965).

With regard to the question of voluntariness, the Pennsylvania Supreme Court "noted, that the record discloses that the trial court did not conduct a preliminary hearing in the absence of the jury to determine the admissibility of the testimony of the 'tacit admission' as may be required by Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Since no objection to the introduction of the testimony on the ground of voluntariness was suggested or interposed at trial, the issue may not be raised at this late date. * * * We need not reach the question of whether or not evidence of 'tacit admissions' comes within the purview of *Jackson,* supra." Commonwealth ex rel. Shadd v. Myers, supra, 423 at p. 91, 223 A.2d at p. 301.

The District Attorney now argues that since the Pennsylvania Supreme Court refused to consider the issue of voluntariness because it considered it waived, we must remand the case to the state courts if we determine that there was no effective waiver. We do not agree.

■ It is apparent to us that the same procedural default which precluded the Pennsylvania Supreme Court from considering the issue of voluntariness in the *Shadd* case also barred it from examining the applicability of the involuntary confession doctrine to this case. Pennsylvania has said, in effect, that where a defendant at trial fails to object *explicitly* to the admission of a confession on the ground that it is involuntary, he waives that objection and may not raise it on direct appeal or collateral attack. · If this state rule of evidence serves a legitimate state interest, a remand to the state courts for further proceedings, as the District Attorney suggests, would be unwarranted if not presumptuous on our part. See Henry v. State of Mississippi, 379 U.S. 443, 85

S.Ct. 564, 13 L.Ed.2d 408 (1965); United States ex rel. Singer v. Myers, 260 F.Supp. 91 (E.D.Pa.1966); and see Commonwealth ex rel. Fox v. Maroney, 417 Pa. 308 at pp. 312–313, 207 A.2d 810 (1965), where the Pennsylvania Supreme Court adopts the reasoning in *Henry*.

However, it is significant that Mr. Justice Roberts, in his dissent in *Shadd*, suggests that the majority was in error in refusing to consider the issue of voluntariness. As he properly notes, "Shadd's counsel * * * had no reason to suspect that a tacit admission could be excluded nor could he be expected to have foreseen the holding of Jackson v. Denno, supra; hence, there can be no waiver of any objection. * * * Since the holding of Jackson is retroactive, this case should be returned for a factual hearing, if as the majority intimates, but declines to decide, tacit admissions are included within the scope of that decision." Commonwealth ex rel. Shadd v. Myers, supra, 423 Pa. at p. 92, 223 A.2d at p. 302.

■ If Shadd's counsel, representing his client in a 1960 trial, could not be expected to raise the specific objection of voluntariness of a tacit confession, surely Smith's counsel could not have been expected to do so in 1950. In fact, Smith's attorney did make a general objection to the receipt in evidence of the tacit admissions. No colloquy among court and counsel ensued respecting the exact nature of the objection, so that it would surely seem to be open for relator to argue alternative legal theories to the Pennsylvania courts in his subsequent petition for collateral relief. It is certainly impossible to say that relator knowingly and intentionally waived constitutional objections relating to voluntariness. See Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). And even under the "legitimate state interest" rubric, we have great difficulty in discerning how the cause of orderly justice is in the slightest degree served by barring relator's contentions here. Under the circumstances, there is much to be said for the recently articulated proposition that state procedural default rules, precluding subsequent review by state courts, which fail to serve a legitimate state purpose may be themselves unconstitutional impediments to a fair system of criminal justice and must be struck down. See Note, 80 Harv. L.Rev. 422, 433–437 (1966).

Here, Pennsylvania has apparently foreclosed one of relator's primary contentions simply because his attorney did not have the delphic foresight to object to the introduction of a tacit admission on the ground that it was an involuntary confession subject to the preliminary hearing requirements of a United States Supreme Court decision to be handed down fourteen years later. It is at least open to question whether this construction of "waiver" is constitutionally permissible when the objection clearly appears on the face of the record and the likelihood of disservice to the Commonwealth's interest in orderly procedure is not manifest.

■■ However, we need not decide whether Pennsylvania's construction of a procedural default barring review was itself an unconstitutional deprivation of due process, for it is perfectly clear that the Pennsylvania Supreme Court was convinced that even if the issue of voluntariness could have been considered, at the very most a *Jackson* hearing would have been required. We do not agree, and for the reasons which follow, we hold that a tacit admission is involuntary *per se* and its use is thus barred by the Due Process clause of the Fourteenth Amendment. Although Mr. Justice Roberts' dissents in *Shadd* and *Smith* indicate that he might well concur in our conclusion, we have little hesitancy in concluding that the majority of the Court would not. Therefore, since reapplication to the courts of Pennsylvania would be futile, relator has exhausted available state remedies and the matter is ripe for disposition by this court.

### III.

■ There is a curious lack of direct authority for the proposition that

the use of tacit admissions or confessions is violative of the Due Process clause of the Fourteenth Amendment, aside from the Fifth Amendment's privilege against self-incrimination, now made applicable to state criminal proceedings, Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), but apparently with prospective effect only. Tehan v. U. S. ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1965). However, we think that neither this Circuit nor the Supreme Court would sustain the validity of a tacit admission as evidence in any criminal proceeding, no matter when it took place. See Note, 79 Harv.L.Rev. 935, 1036–1044 (1966). The reasons for this result are compelling.

*First,* the tacit admission is involuntary *per se*.[3] It springs not from the exercise of a free will, but from a legal fiction: the supposedly valid hypothesis that failure to deny an accusation of guilt constitutes an affirmative admission of culpability, proof of which may be received into evidence under the exception to the hearsay rule for admissions. See Commonwealth v. Vallone, 347 Pa. 419, 32 A.2d 889 (1943); *but see id.* at 424 (dissent). We believe that this rule of evidence offends the higher mandate of constitutional due process which we are bound to enforce.

There is no question that under Pennsylvania's own doctrinal teachings, the tacit admission is equivalent to a confession of the accusations contained in the statements with which the accused is confronted and to which he remains mute:

"The rule of evidence is well established that when a statement made in the presence and hearing of a person is incriminating in character and naturally calls for a denial but is not challenged or contradicted by the accused although he has opportunity and liberty to speak, the statement and the fact of his failure to deny it are admissible in evidence as an implied admission of the truth of the charges thus made. The justification of this rule is to be sought in the age-long experience of mankind that ordinarily an innocent person will spontaneously repel false accusations against him, and that a failure to do so is therefore some indication of guilt." Commonwealth v. Vallone, supra, 347 Pa. at p. 421, 32 A.2d at p. 890, relied upon in Commonwealth ex rel. Shadd v. Myers, supra, and Commonwealth ex rel. Smith v. Rundle, supra.

But while Pennsylvania has recognized that a prerequisite to the admission of such a "confession" is the "liberty to speak" when confronted with accusations, it has failed to recognize that a confession must be the product of a voluntary will—the active will to confess—and voluntariness necessarily implies choice. As the Supreme Court emphasized in Lisenba v. People of State of California, 314 U.S. 219, 241, 62 S.Ct. 280, 292, 86 L.Ed. 166 (1941), the defendant may not be deprived "of his free choice to admit, to deny, or to refuse to answer" police questions. See also Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745 (1964); Blackburn v. State of Alabama, 361 U.S. 199, 207, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960) ("rational choice"); Reck v. Pate, 367 U.S. 433, 81

---

3. We use the term "involuntary *per se*" to distinguish the usual case of a coerced confession, the validity of which is determinable only after a factual hearing has been held, both at the trial stage, Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and, if necessary, at the collateral review level as well, Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1964). The necessity for a hearing in such cases is obvious: the question of co-

ercion is dependent on a matrix of circumstantial evidence much of which can be assessed only by reference to the credibility of the witnesses. In the case of tacit admissions, however, the facts pertinent to the constitutional question are always the same: the use of accusatory statements by third parties, made in the presence of the defendant and not denied by him, as admissions. Thus, there is no need for a factual hearing.

S.Ct. 1541, 6 L.Ed.2d 948 (1961); Ward v. State of Texas, 316 U.S. 547, 555, 62 S.Ct. 1139, 1143, 86 L.Ed. 1663 (1942) (free "to admit or to deny or to refuse to answer"); Watts v. State of Indiana, 338 U.S. 49, 54, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949) (right to "refusal of disclosure"); Note, 79 Harv.L.Rev. 935, 981 (1966).

■■■ Thus, the focus of concern in confession cases is not the objective pressure brought to bear on the accused·· by the police, although this may be a relevant factor, see Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966), but his subjective state of mind at the time he confesses. Townsend v. Sain, supra. A confession wrung from a defendant who professes his continuing innocence until his will is overcome is obviously excludable. Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). But so is a confession which is "freely made" only because the defendant literally could not or did not have the conscious choice to remain silent. See e. g., Townsend v. Sain, supra, 372 U.S. at p. 324, 83 S.Ct. at p. 745 (concurring opinion of Mr. Justice Goldberg). Where the confession or admission is not "the product of a rational intellect and a free will," id. at p. 307, 83 S.Ct. at p. 754, it must be excluded.

■■■ It need hardly be repeated that a coerced or involuntary confession will not be admissible simply because it is true. Rogers v. Richmond, supra. Due process standards are offended by the admission of such statements. True, it is often suggested that such confessions are inherently untrustworthy and impair the validity of the guilt-ascertainment process. Hence, the constitutional protection in the area of involuntary confessions is said to be retroactive while the more recently enunciated formalisms of the Fifth Amendment privilege against self-incrimination are of prospective applicability only. Tehan v. Shott, supra; Johnson v. State of New Jersey, supra. But there is no question that it is not for

us to test the truthfulness of involuntary confessions on a case by case basis; only the issue of voluntariness itself is subject to our scrutiny. If the confession is involuntary, it must be excluded. The simple reason is that due process cannot in any case condone the use of evidence which is elicited from a defendant without the concurrence of his conscious, free, unfettered will, whatever its otherwise probative value. We prize too highly the right of the individual "to be let alone" to permit the police to profit from their improprieties. It is not enough to say that a confession was not obtained against the will of the defendant: the confession can be admitted only if the defendant willed it, if he actively, freely and voluntarily chose to confess.

■■■ Quite obviously, this relator did not choose to confess. Despite protracted interrogation, the police were wholly unsuccessful in obtaining an oral or written confession from Smith. The most that the prosecution's police witnesses could say was that relator said nothing He chose to remain silent and, of course, however culpable he might have been, he had a right to be protected in that choice. Relator's own testimony was to the effect that he actively denied the facts averred in the statements with which he was confronted. He wished to admit nothing. One thing is clear: under *no* interpretation of the facts did relator evidence any voluntary affirmative verbal indication of assent to the statements. Nonetheless, the courts of Pennsylvania permitted the jury to find that Smith "confessed." Although an inculpatory admission was not forced from his lips, his seemingly—and perhaps purposefully—uncommunicative demeanor was made to speak against him. To penalize relator by admitting against him the evidence of his silence vitiated his free choice; it made a parody of his silence.

Confronted with the statements of his co-conspirators, Smith had three choices. He could freely admit the truth of the statements. He could freely deny the truth of the statements. Or he could

freely refuse to communicate with the police. Relator obviously did not freely admit the veracity of the accusations. If he denied the statements, Pennsylvania would have ¡excluded them. We hold that his choice to remain silent was equally entitled to protection.

■■■ We wish to emphasize that our holding is in no way dependent upon` the specific Fifth Amendment privilege against self-incrimination, which we concede may not be applicable to this case. Tehan v. Shott, supra.[4] Comment· on the failure of the accused to testify or, as here, his refusal to cooperate with the police, now clearly constitutes a violation of the Fifth Amendment whose strictures are—at least in this respect—equally applicable to the states. Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); Griffin v. State of California, supra; Miranda v. State of Arizona, 384 U.S. 436 at p. 468 n. 37, 86 S.Ct. 1602 (1966). If the jury is permitted to draw an inference from these omissions, a heavy penalty on the invocation of the privilege results and the integrity of the constitutional protection is seriously impaired.

■ However, even though the Fifth Amendment privilege is not designed primarily to ensure the validity of the truth-ascertainment process, but rather to safeguard a more fundamental constitutional guarantee of individual freedom, the Supreme Court has held its applicability to the states prospective only. Tehan v. Shott, supra; see Mishkin, The High Court, the Great Writ, and the Due Process of Time and Law, 79 Harv.L.Rev. 56 (1965). But the Supreme Court's rules regarding involuntary confessions are available without regard to when the objectionable conduct may have occurred. Johnson v. State of New Jersey, supra. Indeed, we think that even in a legal universe without a privilege against self-incrimination, relator could not have been required by the police to confirm or deny the accusatory statements—or suffer for his silence. Cf. Brown v. State of Mississippi, 297 U.S. 278, 285–286, 56 S.Ct. 461, 80 L.Ed. 682 (1936).

Relator here was exposed to specific factual accusations, which, we must assume, he refused to confirm or deny. Under the tacit admission fiction, the jury was permitted to find that he adopted those accusatory statements as true. In effect, the relator was forced to confess as surely as if the police had guided his hand to sign an inculpatory statement which they had prepared. To conclude that the absence of a verbal response can be used to incriminate an accused when it is clear that there was no. desire to concede anything is to sanction the use of a confession which is rendered involuntary by the very principle of state law which makes it admissible. Indeed, involuntariness is the hallmark of the tacit confession rule and so, we think, its inherent constitutional infirmity. For although it is said that silence bespeaks guilt, the Constitution clearly will not permit an unspoken admission to be used against the accused who seals his lips against the challenging menace of police inquiry. See Note, 79 Harv.L.Rev. 935, 1042–1043 (1966).

■ *Second*, we believe that, at least in this case, the tacit admission is objectionable as well on more general due process grounds. The ambiguities which surround such evidence deprive the finder of fact of reliable guides with which to draw reasonable inferences of fact. See, Note, 79 Harv.L.Rev. 935, 1043–1044 (1966). This evil is especially pronounced here.

The police were allowed to relate on the witness stand what relator's accomplices had said in his presence and his reaction upon hearing these supposed accusations. The record shows that there· was a marked discrepancy between these oral statements and the

---

4. There can be no doubt that a "tacit admission" violates the Fifth Amendment. McCarthy v. United States, 25 F.2d 298 (C.C.A.6, 1928); Ivey v. United States, 344 F.2d 770 (C.A.5, 1965). But these cases were before *Malloy*.

written statements taken from Young and Collins, which were also introduced into evidence. Thus, it is not even entirely clear what Smith was confronted with when he did whatever he did—or did not do. If the accusations were of no greater force than those in the written statements, it might be easily understood why Smith would say nothing—his accomplices' remarks were inconclusive. On the other hand, if the recollection of the police as to the oral statements was correct, relator would be more likely to have denied them because they seemed more damaging to him. Smith, of course, testified that he did deny the statements. The police heard no such denial.[5] To the written statements, they said he remained mute. To the oral statements, they said he clenched his lips and shook his head. Was this a flat denial? A sign of determination to say nothing until he received the assistance of counsel? The sign of disgust at his accomplices' mendacity? Or was it, as the trial judge promptly characterized the movement, an indication of "consternation"?[6] We hold that under circumstances such as these, any attempt to verbalize relator's virtual inaction cannot, as a matter of due process, be condoned.

■ It cannot be inferred from these facts that the relator either denied or affirmed the accusatory statements. Indeed, his state of mind might have been such that he had resolved to say or do nothing until arraigned and afforded counsel. Even if the police alone are

wholly to be believed, we can draw no inference one way or the other from relator's reactions to the statements, nor, we think, could the jury properly do so. It must be borne in mind that under the trial court's instructions, a denial could not be considered by the jury. Thus, the finder of fact was required to ascertain whether relator's response was a denial or affirmance. We hold that it could not logically do so. To permit the jury to speculate wildly on a matter affecting relator's very life and liberty was constitutionally impermissible.

## IV.

■ Pennsylvania has now abandoned prospectively[7] the tacit confession as an evidentiary device for the ascertainment of guilt. But this pernicious rule has perverted the pursuit of justice in the past as well. We respect the judgment of the courts of the Commonwealth, but we cannot in good conscience allow a conviction to stand upon evidence improperly obtained and so glaringly unreliable. Due process demands that the writ be granted.

## V.

The relator also alleged as a ground for granting the writ certain prejudicial remarks by the trial judge in the course of his charge.[8] What we have said above renders unnecessary a decision on the merits of this objection. However, by the same token, we do not wish our silence on this issue to be construed as tacit approval of the trial

5. Detective Jones' testimony on this point is equivocal. See N.T. 124 et seq.

6. It is significant that the record is necessarily barren of demonstrative evidence which might permit a reviewing court to determine whether relator's actions had any probative value. All that appears where the police try to simulate relator's responses is "(indicating)" (N.T. 112–113).

7. The recently decided case of Commonwealth v. Dravecz, 424 Pa. 582, 227 A.2d 904 (1967) focuses the problem more clearly, but apparently would not change the result in this case. See the concurring

opinion of Mr. Justice Eagen, in which he is joined by a majority of the Court.

8. The trial judge volunteered that a verdict of not guilty "would be a miscarriage of justice, so far as I am concerned" (N.T. 161) and proceeded to demonstrate "intelligently and impartially and logically why under the law, I said what I did say." (N.T. 162). Any verdict other than first degree murder would have been "totally illogical and not at all in accord with the admitted circumstances in the situation." (N.T. 163). See also N.T. 177.

court's conduct. Therefore, we will reserve ruling on this point now.

We wish to express our gratitude to relator's court-appointed counsel, Robert J. Sugarman, Esquire, whose efforts evidenced both a high sense of purpose and the professional competence with which to fulfill that purpose.

Writ granted.