210 So.2d 739 (1968)
William M. SULT, Superintendent of the Florida School for Boys at Okeechobee, Florida, Appellant,
v.
D. Wayne WEBER, Appellee.
No. 1619.
District Court of Appeal of Florida. Fourth District.
May 27, 1968.
Earl Faircloth, Atty. Gen., Tallahassee, and James T. Carlisle, Asst. Atty. Gen., Vero Beach, for appellant.
John A.W. Camillo, of Howard, Camillo, Powers & Payne, Fort Lauderdale, for appellee.
*740 BARNS, PAUL D., Associate Judge.
The lower court, upon petition for writ of habeas corpus and respondent's return, remanded petitioner's son, Rodney Oswald Weber, to the Broward County Juvenile Court for a rehearing within sixty days on the adjudication of the delinquency on which he stood committed, whereupon respondent entered this appeal. The order of remand held that In re Gault, 1967, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527, was retroactive in effect and governed. We reverse.
The amended petition for habeas corpus states that Rodney was committed pursuant to two petitions filed in the juvenile court by the court's counsellor, Brian LaVerrier, one on September 7, and another on September 26, 1966.

FIRST ADJUDICATION OF DELINQUENCY
The amended habeas corpus petition states that prior to the filing of petitions against Rodney in the juvenile court on September 7 and 26, 1966, by Brian LaVerrier, counsellor of that court, Rodney was interrogated by the counsellor and did admit to him "to being publicly intoxicated and using a motor vehicle without authorization."
Thereafter, at a hearing in the Broward County Juvenile Court on October 11, 1966, after "all parties entitled to notice of this hearing having been duly notified", and "the Court having heard the evidence", made findings that:
"* * * RODNEY OSWALD WEBER, a boy of the age of sixteen years and residing in Broward County, Florida, to be a delinquent child within the intent and meaning of Florida Statutes, in that, this boy has violated the laws of the State of Florida having to do with the consumption of alcoholic beverages and public intoxication, to-wit: that on or about August 26, 1966, this boy did admittedly consume alcoholic beverages and was publicly intoxicated at the entrance to the National Guard Armory, State Road #84 and 4 Avenue, Fort Lauderdale, Florida; FURTHER, this boy had been referred to this Court as recently as August 13, 1966 and resisting an officer with violence while being placed under arrest for disorderly conduct; FURTHER, that on or about September 13, 1966, this boy, accompanied by another, did admittedly steal in Pompano Beach, Florida an automobile belonging to one Douglas Barnes; FURTHER, as a result of the above set out misbehavior this boy was taken into custody and placed in the Juvenile Quarters of the Broward County Jail on September 16, 1966 where he remained until September 19, 1966 on which date he was placed in detention at Junior Haven where he has remained until today and while so detained his behavior has been good; FURTHER, that this is the tenth referral of this boy to the office of this Court for various types of delinquent behavior dating from June of 1963, one of which resulted in his commitment to The Florida School for Boys in January of 1965 from where he returned in April of 1966 with considerable progress being made in his academic studies while he attended; FURTHER, that this boy has been enrolled in a program of intense psychological therapy and it is requested, both by his parents and a counsellor of this Court, that he be given one final opportunity of remaining in said program under probationary supervision; FURTHER, it is the opinion of the Court that the interests of this boy, as well as those of his parents and society, might be best served by giving him one final opportunity of returning home with his parents, there to voluntarily mend his ways, before having to resort to more drastic measures."
Thereupon, the juvenile court placed Rodney on probation and suspended the twelve month sentence then imposed, as follows:
"It is thereupon ORDERED, ADJUDGED and DECREED that: RODNEY *741 OSWALD WEBER, a delinquent boy, shall be committed to the Juvenile Quarters of the Broward County Jail, there to remain for a period of twelve (12) months, with the recommendation that the Sheriff of Broward County transfer him to the County Stockade there to perform useful tasks within his ability, however, that execution of said detention commitment shall be withheld and suspended from day to day and that he shall be returned to detention at Junior Haven, there to remain until he can, by his continuing to adjust, earn consideration for his release, in which event he shall then be released back into the custody of his parents, on probation, under the supervision of Counselor Brian LeVerrier and under such rules as said counselor might impose, for just and only so long as he does observe the following Court imposed conditions of said probation:
"1. That he shall not violate any law of the United States, the State of Florida, or municipalities thereof;
"2. That he shall regularly attend school and apply himself to his studies while so attending;
"BE IT UNDERSTOOD by both this boy and his parents that any violation of the above set out Court imposed rules of his probation will cause this Court, without further delay, to invoke the withheld twelve month detention commitment to the County Stockade;"

SECOND ADJUDICATION OF DELINQUENCY

REVOCATION OF PROBATION
On December 29, 1966, a Hollywood policeman called on Rodney at his home and without success attempted to procure a confession from Rodney that he had participated in an assault by showing him two unsigned statements purported to have been made by others implicating Rodney. On the next day, the policeman telephoned Rodney's father and advised him that Rodney was to be incarcerated, but could stay with his father until after the holidays, viz., January 3, 1967, on which date his father brought Rodney to the Hollywood Police Station pursuant to instructions, where Rodney "signed a purported statement implicating him in the assault", after being "confronted with the purported confessions of his alleged accomplices". Thereupon, Rodney was confined and held in the Juvenile Detention Home of Broward County.
On January 12, 1967, Rodney's father was telephoned by the counsellor that there would be a delinquency hearing for Rodney on January 24, 1967, but that the hearing "would not amount to much" and that Rodney would not be sentenced to the Boys School at Okeechobee or Marianna.
On January 24, 1967, both parents appeared at the hearing, at the conclusion of which the judge entered the order of revocation of probation and commitment. The order of revocation recites that it was after "all parties entitled to notice of this hearing having been duly notified", and after the court having heard the evidence upon which the court made findings that:
"* * * RODNEY OSWALD WEBER, a boy of the age of sixteen years and residing in Broward County, Florida, and who was adjudged delinquent by an Order of this Court dated October 11, 1966 after which date he was released on probation to his parents, to have violated the terms and conditions as set forth in said Order of Probation by violating the laws of the State of Florida having to do with assault, to-wit: that on or about October 31, 1966 this boy, accompanied by two older companions, did admittedly throw paint in the face of one Warren Leslie Kishbaugh, 7860 N.W. 26th Street, Hollywood, Florida; FURTHER, that although this boy was the one who threw said paint he did permit a companion to assume the blame, which resulted in said companion being sentenced to jail for 120 days; FURTHER, from all indications this boy *742 is not remorseful of the above set out misdeed, but rather he has, in overheard conversations, talked about said offense like it was some sport or game; FURTHER, this boy has been referred to this Court on at least ten (10) previous occasions for various types of delinquent behavior dating from June of 1963, one of which resulted in his commitment to the Florida School for Boys in January of 1965 from where he returned in April of 1966; FURTHER, it appears that all efforts at the local level, including intensive psychological therapy, with which to cope with this boy and his misbehaving ways have met with little or no success, and it is the opinion of the Court that if this boy is to ever become successfully adjusted as to matters of behavior that additional strict guidance and supervision in a controlled environment, for a considerable period of time, with an opportunity to receive further psychological assistance, is most essential, which said guidance and supervision might be best afforded by permitting him to attend the Florida School for Boys."
Whereupon, Rodney was committed, together with the recommendations of the judge, to the "Florida School for Boys, there to remain until he shall have earned his release." The court retained jurisdiction to make further or other orders "for the welfare of said child".
Petitioner's grounds for relief are that:
(1) Rodney was not advised of his constitutional rights to be represented by counsel or his constitutional right protecting him against self-incrimination [1] before making the admission to the counsellor of public intoxication and using the motor-vehicle of another without authorization, relative to the October, 1966 hearing; [2] or, before signing the confession at the police station on January 3, 1967, relating to an assault.
(2) The court proceeded on the October, 1966, delinquency hearing without apprising Rodney, or his parents, of his constitutional right to be represented by counsel.
(3) The court on the January 24, 1967, hearing proceeded without apprising Rodney, or his parents, of his right to be represented by counsel.
(4) Neither Rodney nor his parents were given formal or written notice of the charges.
(5) Rodney was denied his constitutional right to trial by jury.
Since the hearings in the Juvenile Court under collateral attack were before Gault, we conclude that the failure to advise Rodney or his parents of their rights to be represented by counsel is not a ground for relief, without more.
The petition states that Rodney was "intimidated into signing a purported confession" which intimidation appears to consist of interrogation by a police officer who confronted Rodney with signed confessions of his accomplices. There is no showing of fraud, misrepresentation, or promises or mistake by the police officer. It does not appear that Rodney was in any way "wrongfully" intimidated or coerced. Of course, if Gault is to be retrospectively applied, the petitioner is entitled to relief since he was not advised of his constitutional right to remain silent or of his constitutional right to assistance of counsel.
The adjudication under attack recites that the hearings came on to be heard on "petition filed", which petitions are not in the record. Neither are the "confessions". Petitioner states that "at no time was a written or formal citation or petition served upon or given to" Rodney or his parents. There is no allegation that they were not fully informed of the charges. Of course, they should have been "served" with a copy, as now exacted by Gault, a reasonable time before the hearing. There is nothing in the record to show that Rodney or his parents were not given a full and fair hearing or that either was not fully advised of the charges involved at each hearing and the purpose of the hearings.
*743 Since 1899 when the first court in a new system for the treatment of juvenile offenders was established in Illinois, the system has now been expanded in all of the fifty states. As stated by James P. White in The Juvenile and the Court: A Continuing Dialogue, 44 North Dakota Law Review, 211 (Winter, 1968):
"* * * The basic conceptions which traditionally have distinguished juvenile courts from other courts can be briefly stated.
`Children are to be dealt with separately from adults. Their cases are to be heard at a different time and, preferably, in a different place; they are to be detained in separate buildings, and, if institutional guidance is necessary, they are to be committed to institutions for children. Through its probation officers the court can keep in constant touch with the children who have appeared before it. Taking children from their parents is, when possible, to be avoided; on the other hand, parental obligations are to be enforced. The procedure of the court must be as informal as possible. Its purpose is not to punish but to save. It is to deal with children not as criminals but as persons in whose guidance and welfare the State is peculiarly interested. Save in the cases of adults, its jurisdiction is equitable, not criminal in nature. * * *'
"Formal criminal court procedures including indictment, formal prosecution, guaranteed representation by legal counsel and trial by jury were not provided, but rather the proceeding became one in the nature of a dialogue between the judge and the child. The courts were considered civil rather than criminal and the child appearing before the court became a ward of the state rather than a prisoner of the state."
Gault recognized that the informal practices and procedures of the juvenile court systems, when the new fundamental requirements of due process as stated in Miranda v. State of Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 were not followed, has "all too often" contributed to dire consequences, and stated:
"Accordingly, the highest motives and most enlightened impulses led to a peculiar system for juveniles, unknown to our law in any comparable context. The constitutional and theoretical basis for this peculiar system is  to say the least  debatable. And in practice, as we remarked in the Kent case, [383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84] supra, the results have not been entirely satisfactory. Juvenile Court history has again demonstrated that unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure. In 1937, Dean Pound wrote: `The powers of the Star Chamber were a trifle in comparison with those of our juvenile courts * * *.'
The absence of substantive standards has not necessarily meant that children receive careful, compassionate, individualized treatment. The absence of procedural rules based upon constitutional principle has not always produced fair, efficient, and effective procedures. Departures from established principles of due process have frequently resulted not in enlightened procedure, but in arbitrariness. The Chairman of the Pennsylvania Council of Juvenile Court Judges has recently observed: `Unfortunately, loose procedures, high-handed methods and crowded court calendars, either singly or in combination, all too often, have resulted in depriving some juveniles of fundamental rights that have resulted in a denial of due process.'
"Failure to observe the fundamental requirements of due process has resulted in instances, which might have been avoided, of unfairness to individuals and inadequate or inaccurate findings of fact and unfortunate prescriptions of remedy. * * *"

*744 NOTICE OF CHARGES
The petition filed in the juvenile court in Gault merely alleged in general terms that the child is "neglected, dependent or delinquent"; the petition followed the state statute which explicitly states that such a general statement is sufficient "without alleging the facts". There was no "requirement that the petition be served and it was not served upon, given to, or shown to Gerald [Gault] or his parents." The Supreme Court concluded that such socialized procedure should be ended because it was not conducive to a fair hearing and held:
"* * * Notice, to comply with due process requirements, must be given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded, and it must `set forth the alleged misconduct with particularity.' It is obvious, as we have discussed above, that no purpose of shielding the child from the public stigma of knowledge of his having been taken into custody and scheduled for hearing is served by the procedure approved by the court below. The `initial hearing' in the present case was a hearing on the merits. Notice at that time is not timely; and even if there were a conceivable purpose served by the deferral proposed by the court below, it would have to yield to the requirements that the child and his parents or guardian be notified, in writing, of the specific charge or factual allegations to be considered at the hearing, and that such written notice be given at the earliest practicable time, and in any event sufficiently in advance of the hearing to permit preparation. Due process of law requires notice of the sort we have described  that is, notice which would be deemed constitutionally adequate in a civil or criminal proceeding. It does not allow a hearing to be held in which a youth's freedom and his parents' right to his custody are at stake without giving them timely notice, in advance of the hearing, of the specific issues that they must meet. * * *"

RIGHT TO ASSISTANCE OF COUNSEL
In the juvenile court in Arizona the probation officers are the arresting officers, they initiate the proceedings, file petitions, and are often the witness against the child, which practice is doubtless common in the different systems dealing with the juvenile problem; Gault held that the probation officer under such circumstances could not act as counsel for the child and stated:
"* * * A proceeding where the issue is whether the child will be found to be `delinquent' and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution. The juvenile needs the assistance of counsel to cope with problems of law, to make skilled inquiry into the facts, to insist upon regularity of the proceedings, and to ascertain whether he has a defense and to prepare and submit it. The child `requires the guiding hand of counsel at every step in the proceedings against him.' Just as in Kent v. United States, supra, 383 U.S., [541,] at 561-562, 86 S.Ct., [1045,] at 1057-1058, we indicated our agreement with the United States Court of Appeals for the District of Columbia Circuit that the assistance of counsel is essential for purposes of waiver proceedings, so we hold now that it is equally essential for the determination of delinquency, carrying with it the awesome prospect of incarceration in a state institution until the juvenile reaches the age of 21.
"* * *
"We conclude that the Due Process Clause of the Fourteenth Amendment requires that in respect of proceedings to determine delinquency which may result in commitment to an institution in which the juvenile's freedom is curtailed, the child and his parent must be notified of the child's right to be represented by counsel retained by them, or if they are unable to afford counsel, that counsel will be appointed to represent the child."

*745 CONFRONTATION, SELF-INCRIMINATION, CROSS-EXAMINATION
The juvenile court in Gault proceeded on the basis of the juvenile's admissions. Gault held:
"The privilege against self-incrimination is, of course, related to the question of the safeguards necessary to assure that admissions or confessions are reasonably trustworthy, that they are not the mere fruits of fear or coercion, but are reliable expressions of the truth. The roots of the privilege are, however, far deeper. They tap the basic stream of religious and political principle because the privilege reflects the limits of the individual's attornment to the state and  in a philosophical sense  insists upon the equality of the individual and the state. In other words, the privilege has a broader and deeper thrust than the rule which prevents the use of confessions which are the product of coercion because coercion is thought to carry with it the danger of unreliability. One of its purposes is to prevent the state, whether by force or by psychological domination, from overcoming the mind and will of the person under investigation and depriving him of the freedom to decide whether to assist the state in securing his conviction.
"It would indeed be surprising if the privilege against self-incrimination were available to hardened criminals but not to children. The language of the Fifth Amendment, applicable to the States by operation of the Fourteenth Amendment, is unequivocal and without exception. And the scope of the privilege is comprehensive. As Mr. Justice White, concurring, stated in Murphy v. Waterfront Commission, 378 U.S. 52, 94, 84 S.Ct. 1594, 1611, 12 L.Ed.2d 678 (1964):
`The privilege can be claimed in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory. * * * it protects any disclosures which the witness may reasonably apprehend could be used in a criminal prosecution or which could lead to other evidence that might be so used.'

"* * *
"We conclude that the constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults. We appreciate that special problems may arise with respect to waiver of the privilege by or on behalf of children, and that there may well be some differences in technique  but not in principle  depending upon the age of the child and the presence and competence of parents. The participation of counsel will, of course, assist the police, Juvenile Courts and appellate tribunals in administering the privilege. If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair."

CONFRONTATION AND CROSS-EXAMINATION
To insure that an adjudication of delinquency be based on trustworthy evidence, Gault held:
"* * * No reason is suggested or appears for a different rule in respect of sworn testimony in juvenile courts than in adult tribunals. Absent a valid confession adequate to support the determination of the Juvenile Court, confrontation and sworn testimony by witnesses available for cross-examination were essential for a finding of `delinquency' and an order committing Gerald to a state institution for a maximum of six years.
"* * *
"As we said in Kent v. United States, 383 U.S. 541, 554, 86 S.Ct. 1045, 1053, 16 *746 L.Ed.2d 84 (1966), with respect to waiver proceedings, `there is no place in our system of law for reaching a result of such tremendous consequences without ceremony * * *.' We now hold that, absent a valid confession, a determination of delinquency and an order of commitment to a state institution cannot be sustained in the absence of sworn testimony subjected to the opportunity for cross-examination in accordance with our law and constitutional requirements."

GAULT: PROSPECTIVE LIMITATIONS
As stated by the court, Gault is restricted to the adjudicatory stage and "has no necessary applicability to other steps of the juvenile process" (Note 48, 87 S.Ct. 1445). "We are not here concerned with the procedures or constitutional rights applicable to the pre-judicial stages of the juvenile process, nor do we direct our attention to the post-adjudicative or dispositional process." Gault, supra, 387 U.S. 1, 13, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527. Gault clearly recognized that the standards therein stated were not merely newly discovered constitutional rights, but were newly extended applications of new constitutional standards to a system of courts unknown to the common law which are sui generis in nature.
As stated by Justice Stewart in his dissent:
"Juvenile proceedings are not criminal trials. They are not civil trials. They are simply not adversary proceedings. Whether treating with a delinquent child, a neglected child, a defective child, or a dependent child, a juvenile proceeding's whole purpose and mission is the very opposite of the mission and purpose of a prosecution in a criminal court. The object of the one is correction of a condition. The object of the other is conviction and punishment for a criminal act."
Gault carries with it a prospective limitation and carries no necessary applicability to prior adjudications on collateral attack.
Gault clearly extended new constitutional criminal procedure standards to the juvenile courts' systems of the fifty states. The cases of Linkletter v. Walker, 1965, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601; Tehan v. United States ex rel. Shott, 1966, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453; Johnson v. State of New Jersey, 1966, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882; and Stovall v. Denno, 1967, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, have prospectively limited the application of new constitutional standards.
Linkletter, supra, gives detailed treatment to the factors considered in determining the question and held: as to a state prisoner whose judgment of conviction had become final and not subject to further direct attack, that the Mapp rule (Mapp v. State of Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081) did not operate retrospectively on cases finally decided prior to Mapp which now requires exclusion of such evidence as was admitted against Linkletter, in a case tried before Mapp. The court applied prospective limitation to Mapp after reasoning:
"Finally, there are interests in the administration of justice and the integrity of the judicial process to consider. To make the rule of Mapp retrospective would tax the administration of justice to the utmost. Hearings would have to be held on the excludability of evidence long since destroyed, misplaced or deteriorated. If it is excluded, the witnesses available at the time of the original trial will not be available or if located their memory will be dimmed. To thus legitimate such an extraordinary procedural weapon that has no bearing on guilt would seriously disrupt the administration of justice."
Tehan v. United States, supra, in habeas corpus, held: adverse comment by a prosecutor *747 or trial judge upon defendant's failure to testify in a state criminal trial violates the federal privilege against compulsory self-incrimination, but that the decision was not to be given retrospective application. In reaching its conclusion of prospective limitation, the court reasoned:
"The last important factor considered by the Court in Linkletter was `the effect on the administration of justice of a retrospective application of Mapp.' 381 U.S., at 636, 85 S.Ct. at 1741. A retrospective application of Griffin v. California would create stresses upon the administration of justice more concentrated but fully as great as would have been created by a retrospective application of Mapp. A retrospective application of Mapp would have had an impact only in those States which had not themselves adopted the exclusionary rule, apparently some 24 in number. A retrospective application of Griffin would have an impact only upon those States which have not themselves adopted the no-comment rule, apparently six in number. But upon those six States the impact would be very grave indeed. It is not in every criminal trial that tangible evidence of a kind that might raise Mapp issues is offered. But it may fairly be assumed that there has been comment in every single trial in the courts of California, Connecticut, Iowa, New Jersey, New Mexico, and Ohio, in which the defendant did not take the witness stand  in accordance with state law and with the United States Constitution as explicitly interpreted by this Court for 57 years.
"Empirical statistics are not available, but experience suggests that California is not indulging in hyperbole when in its amicus curiae brief in this case it tells us that `Prior to this Court's decision in Griffin, literally thousands of cases were tried in California in which comment was made upon the failure of the accused to take the stand. Those reaping the greatest benefit from a rule compelling retroactive application of Griffin would be (those) under lengthy sentences imposed many years before Griffin. Their cases would offer the least likelihood of a successful retrial since in many, if not most, instances, witnesses and evidence are no longer available.' There is nothing to suggest that what would be true in California would not also be true in Connecticut, Iowa, New Jersey, New Mexico, and Ohio. To require all of those States now to void the conviction of every person who did not testify at his trial would have an impact upon the administration of their criminal law so devastating as to need no elaboration.
"We have proceeded upon the premise that `we are neither required to apply, nor prohibited from applying a decision retrospectively.' Linkletter v. Walker, 381 U.S., at 629, 85 S.Ct. at 1738. We have considered the purposes of the Griffin rule, the reliance placed upon the Twining doctrine, and the effect upon the administration of justice of a retrospective application of Griffin. After full consideration of all the factors, we are not able to say that the Griffin rule requires retrospective application."
After observing that for "more than half a century, beginning in 1908, the Court adhered to the position that the Federal Constitution does not require the States to accord the Fifth Amendment privilege against self-incrimination."
United States v. Wade, 1967, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199, were three cases involving like matter which were considered together by the Court. The cases of Wade and Gilbert were on direct attack by certiorari while Stovall was a collateral attack in habeas corpus on prior judgments. Wade and Gilbert received the benefit of new constitutional *748 standards and Stovall did not, even though the grounds for relief in each case were the same in principle.
Stovall held that Wade and Gilbert "affect only those cases and all future cases which involve confrontation for identification purposes conducted in the absence of counsel after this date" (June 12, 1967), and reasoned:
"The unusual force of the countervailing considerations strengthens our conclusion in favor of prospective application. The law enforcement officials of the Federal Government and of all 50 States have heretofore proceeded on the premise that the Constitution did not require the presence of counsel at pretrial confrontations for identification. Today's rulings were not foreshadowed in our cases; no court announced such a requirement until Wade was decided by the Court of Appeals for the Fifth Circuit, 358 F.2d 557. The overwhelming majority of American courts have always treated the evidence question not as one of admissibility but as one of credibility for the jury. Wall, Eye-Witness Identification in Criminal Cases 38. Law enforcement authorities fairly relied on this virtually unanimous weight of authority, now no longer valid, in conducting pretrial confrontations in the absence of counsel. It is, therefore, very clear that retroactive application of Wade and Gilbert `would seriously disrupt the administration of our criminal laws.' Johnson v. State of New Jersey, supra, at 731, 86 S.Ct., at 1780. In Tehan v. United States ex rel. Shott, supra, we thought it persuasive against retroactive application of the no-comment rule of Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.E.2d 106, that such application would have a serious impact on the six States that allowed comment on an accused's failure to take the stand. We said, `To require all of those States now to void the conviction of every person who did not testify at his trial would have an impact upon the administration of their criminal law so devastating as to need no elaboration.' 382 U.S., at 419, 86 S.Ct., at 467. That impact is insignificant compared to the impact to be expected from retroactivity of the Wade and Gilbert rules. At the very least, the processing of current criminal calendars would be disrupted while hearings were conducted to determine taint, if any, in identification evidence, and whether in any event the admission of the evidence was harmless error. Doubtless, too, inquiry would be handicapped by the unavailability of witnesses and dim memories. We conclude, therefore, that the Wade and Gilbert rules should not be made retroactive.
"We also conclude that, for these purposes, no distinction is justified between convictions now final, as in the instant case, and convictions at various stages of trial and direct review. We regard the factors of reliance and burden on the administration of justice as entitled to such overriding significance as to make that distinction unsupportable. We recognize that Wade and Gilbert are, therefore, the only victims of pretrial confrontations in the absence of their counsel to have the benefit of the rules established in their cases. That they must be given that benefit is, however, an unavoidable consequence of the necessity that constitutional adjudications not stand as mere dictum. Sound policies of decision-making, rooted in the command of Article III of the Constitution that we resolve issues solely in concrete cases or controversies, and in the possible effect upon the incentive of counsel to advance contentions requiring a change in the law, militate against denying Wade and Gilbert the benefit of today's decisions. Inequity arguably results from according the benefit of a new rule to the parties in the case in which it is announced but not to other litigants similarly situated in the trial or appellate process who have *749 raised the same issue. But we regard the fact that the parties involved are chance beneficiaries as an insignificant cost for adherence to sound principles of decision-making."
Stovall was a collateral attack by habeas corpus proceedings on a judgment rendered before Stovall. Hence, he was denied retroactive application of Wade and Gilbert. Wade and Gilbert involved direct attacks on judgments under review by certiorari and were granted relief for reasons above quoted from Stovall, supra.
Stovall v. Denno, supra, after citing Linkletter, Tehan and Johnson, in resolving the question of retroactivity of a constitutional rule of criminal procedure, held:
"* * * `These cases establish the principle that in criminal litigation concerning constitutional claims, "`the Court may in the interest of justice make the rule prospective * * * where the exigencies of the situation require such an application'" * * *.' Johnson, supra, 384 U.S. at 726-727, 86 S.Ct., at 1777. The criteria guiding resolution of the question implicates (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards. `The retroactivity or nonretroactivity of a rule is not automatically determined by the provision of the Constitution on which the dictate is based. Each constitutional rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of justice, and the way in which these factors combine must inevitably vary with the dictate involved.' Johnson, supra, at 728, 86 S.Ct. at 1778."
Following the reasoning given for applying prospective limitations in the above-cited cases, we venture to hold that application of Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527, is not applicable in collateral attack on pre-Gault judgments, and the judgment appealed from is reversed.

POST-CONVICTION RELIEF:

HABEAS CORPUS V. CORAM NOBIS BY MOTION
When one has been denied procedural "due process" and post conviction relief, proceedings should be sought by motion made in the trial court and not by habeas corpus in another court. The trial court is the place where the record and files in the case are and where those who know anything about the matter are more likely to be. The motion for relief in the nature of coram nobis is available in the juvenile courts of this state. Tolar v. State, Fla.App. 1967, 196 So.2d 1. The Florida Rules of Civil Procedure nor Criminal Procedure Rule No. 1, (now Rule 1.850, Florida Rules of Criminal Procedure, 33 F.S.A.), are not made applicable to juvenile courts, but such rules are not all comprehensive or exclusive of relief otherwise available under the classical "writs"; the substance of the remedy remains available by motion even when the use of the "writ" is proscribed by rule and the motion is substituted for it. The use of the motion is authorized without a declaratory rule authorizing it. (See Tolar, supra, citing the Honorable John J. Parker.) For scope of the remedy by coram nobis, see Moore's Federal Practice, 2d Ed., §§ 60.13 and 60.14. For a brief summary of the history and use of the writ of coram nobis, see Fugitt v. State, 1904, 85 Miss. 94, 37 So. 554.
Reversed.
WALDEN, C.J., and REED, J., concur.