Richard Gordon **BANNISTER**, Appellant,

v.

**UNITED STATES of America.**

**No. 18073.**

United States Court of Appeals,
Third Circuit.

Argued Jan. 8, 1970.

Reargued Nov. 24, 1970.

Decided July 7, 1971.

Eugene B. Strassburger, III, Strassburger & McKenna, Pittsburgh, Pa., for appellant.

Blair A. Griffith, Asst. U. S. Atty., Pittsburgh, Pa. (Richard L. Thornburgh, U. S. Atty., John H. Bingler, Jr., Asst. U. S. Atty., Pittsburgh, Pa., on the brief), for appellee.

Before HASTIE, Chief Judge, and BIGGS, FREEDMAN,* SEITZ, VAN DUSEN, ALDISERT, ADAMS, GIBBONS and ROSENN, Circuit Judges.

PER CURIAM:

There is no majority opinion in this case. Judges Van Dusen, Adams and Rosenn join in the opinion of Judge Biggs that Bannister's judgments of conviction must be reversed and the case dismissed. Judge Aldisert joins in Judge Hastie's opinion that Bannister's judgments of conviction should be affirmed. Chief Judge Seitz equates his view to Judge Gibbons' opinion that the indictment is invalid and that the judgments of conviction must be reversed.

The judgment of the court is that the judgments of conviction must be reversed and the case dismissed.

BIGGS, Circuit Judge.

The defendant-appellant Bannister pleaded guilty to both counts of an indictment charging him with the unlawful concealment and transportation of marihuana, acquired or obtained without payment of the required transfer tax, in violation of Section 4744(a) (2), Title

---

* Judge Freedman heard the argument and participated in the consideration of this appeal but died before expressing any final view.

26, U.S.C.[1] Two concurrent three year sentences were imposed on him on June 20, 1967. Bannister did not appeal but over a year later petitioned to vacate the judgments of sentence pursuant to Section 2255, Title 28, U.S.C., on the ground that his convictions and sentences violated his Fifth Amendment privilege against compulsory self-incrimination. The trial court denied relief and this appeal followed. The crimes occurred in the Western District of Pennsylvania.

In Leary v. United States, 395 U.S. 6, 27, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), the Supreme Court by Mr. Justice Harlan held a "timely and proper" assertion of the privilege against compulsory self-incrimination to be a complete defense to prosecution under Section 4744(a) (2).

In *Leary*, Mr. Justice Harlan said:

"If read according to its terms, the Marihuana Tax Act compelled petitioner to expose himself to a 'real and appreciable' risk of self-incrimination, within the meaning of our decisions in *Marchetti, Grosso*, and *Haynes*.[2] Sections 4741–4742 required him, in the course of obtaining an order form, to identify himself not only as a transferee of marihuana but as a transferee who had not registered and paid the occupational tax under §§ 4751–4753. Section 4773 directed that this information be conveyed by the Internal Revenue Service to state and local law enforcement officials on request.

"Petitioner had ample reason to fear that transmittal to such officials of the fact that he was a recent, unregistered transferee of marihuana 'would surely prove a significant "link in a chain" of evidence tending to establish his guilt' under the state marihuana laws then in effect." (Notes omitted). Id. at 16, 89 S.Ct. at 1537.

The principal issues on this appeal are whether the assertion of the privilege against compulsory self-incrimination is a complete defense to Bannister's prosecution under § 4744(a) (2) as in *Leary*, and whether *Leary* may be applied retroactively. But several diverse and controversial views have been suggested as possibly applying to Bannister's case which, even if the *Leary* doctrine be applicable, would forefend a decision in his favor. We deem it desirable to dispose of these questions insofar as they can be determined before deciding the principal issues.

I.

A. *As to Plea Bargaining:* It has been suggested that the colloquy set out

---

1. The first count charged that an offense against the statute took place on the 12th day of July, 1966, and the second count charged a similar offense on July 19, 1966.

We are concerned only with that part of Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), which held that the Fifth Amendment assertion of the privilege against compulsory self-incrimination was a complete defense to prosecution for obtaining or transporting marihuana without paying the federal tax. The other holding in *Leary*, viz., that the statutory presumption of knowledge of illegal importation from the mere fact of possession violates due process, is not applicable to the case at bar.

2. Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968). These cases are referred to sometimes as the "*Marchetti Trilogy.*" We shall refer to them on occasion hereinafter either as the "*Marchetti Trilogy*" or as "*Marchetti.*"

In *Marchetti*, the assertion by the defendant of the Fifth Amendment privilege against self-incrimination barred his prosecution for violating the federal wagering tax statutes (26 U.S.C. § 4411–12) (1964 Ed., Supp. 2). In *Grosso*, the assertion by the defendant of the privilege barred his prosecution for failure to pay the excise tax on wagering (26 U.S.C. § 4401), and in *Haynes* v. United States, a similar assertion of the privilege barred Haynes' prosecution under the National Firearms Act (26 U.S.C. § 5851).

below [3] between the court, the assistant district attorney, and counsel for Ban-

nister, during his sentencing, was a kind of plea bargaining. Counsel for the par-

3. See the transcript of the proceedings on sentencing and in particular pp. 27–32, as follows:

"The Court: Well, one thing disturbs me. After you were arrested for this offense and put on bond—which I believe is your own bond—

"Mr. Zurawsky [Assistant United States Attorney]: Yes, it is a surety bond.

"The Court: You were arrested again.

"Mr. Freeland [Counsel for Bannister]: Yes, Your Honor.

"The Court: For violation of the Dangerous Drugs and Cosmetics Act, and currently awaiting disposition in Allegheny County.

"The Defendant: There is some question as to the validity of that arrest, however.

"The Court: There is no doubt you were arrested?

"The Defendant: That is correct.

"Mr. Freeland: I represent him in that case, Your Honor, also. And, without deprecating the work of the local police, after Mr. Bannister was arrested by the federal officer, he remained under surveillance by officers of the City Police on a regular basis, and called me many times and advised me of who was watching him and when and where. And, I attended the preliminary hearing on that case, and I am familiar with the evidence, which consists of a very small quantity of identifiable Marijuana in a pipe. It is really a small quantity, like a dot literally, in a pipe which was out on a terrace outside the apartment where he was.

"And, it so happens that that case is going to be tried on March 13th, and I must tell the Court that I have a great deal more confidence in defending Mr. Bannister in that case than I did in the case brought by the federal agents under the evidence Mr. Moore has presented today.

"The Court: Well, you represent to me that you are not going to plead guilty to that charge?

"Mr. Freeland: No, Your Honor.

"The Court: Well, have you been selling Marijuana since you were put on bond in this case?

"The Defendant: No, I haven't.

"The Court: It has been brought to my attention that you have said that the laws governing the regulation of Marijuana are stupid and unconstitutional. Did you ever say that?

"The Defendant: I probably did, yes.

"The Court: And that you have been smoking Marijuana for approximately the last four years and feel it is no more harmful than the use of tobacco or alcohol. Did you say that?

"The Defendant: I probably did.

"The Court: 'When he needs Marijuana it is sent to him either through the mails or in a suitcase via Greyhound bus.' Did you say that?

"The Defendant: I don't recall.

"The Court: It has been brought to my attention that you said regarding the effect on you that Marijuana makes your senses more acute, gives you a feeling of exhilaration, and in no way limits your ability to function properly.

"The Defendant: That is correct.

"The Court: Is that correct?

"The Defendant: Yes.

"*The Court: I take it you disagree with the Congress of the United States on the subject of Marijuana?*

"*The Defendant: Yes, I do.*

"*Mr. Freeland: Not sufficiently, however, to raise the constitutional question in the trial. I might point out, this is a matter that we did discuss.* [Emphasis added.]

"The Court: Well, until someone persuades the Congress to change its mind, I have to agree with the Congress.

"On each count, it is adjudged that the defendant be committed to the custody of the Attorney General or his authorized representative for imprisonment for a period of ten years and for a study as described in Title 18, United States Code, 4208(c), the results of such study to be furnished this Court within—how long?

"Probation Officer: Three months, Your Honor, or ninety days.

"The Court: Well, I am going to make it sixty days. Can I make it sixty days?

"Probation Officer: I think that they will hurry it up for you.

"The Court: All right, sixty days, or within two months, whereupon the sentence of imprisonment herein imposed shall be subject to modification in accordance with 18 United States Code 4208(c), the sentences to run concurrently.

"Mr. Zurawsky: Any fine or any costs at this time, Your Honor?

"The Court: He will be brought back here, and the final sentence will be at that time.

"Mr. Zurawsky: All right.

"The Court: At which time, I can consider a fine. I will see what they recommend first.

"Mr. Zurawsky: Thank you, Your Honor.

ties agree in stating there was no express plea bargaining. Could there have been, however, a form of implicit plea bargaining? Note 2 cited to the text in United States v. Liguori, 430 F.2d 842, at 844 (2 Cir. 1970), cert. denied, 402 U.S. 948, 91 S.Ct. 1614, 29 L.Ed.2d 118 (1971), states the following:

"[A]n accused charged on several counts including concealing marihuana under 21 U.S.C. § 176a and acquiring marihuana without paying the transfer tax under 26 U.S.C. § 4744(a) may be offered a plea bargain under which he could plead guilty to the tax count alone. Since section 4744(a) carries a lower range of possible sentences, and since first offenders under section 4744(a) are not ineligible for parole and probation as are first offenders under section 176a, see 26 U.S.C. § 7237, such an accused may knowingly and expressly waive his defense of the privilege against self-incrimination to the section 4744(a) count in order to limit his conviction to this count and thereby minimize the possible severity of his punishment."

As we have stated, there were only two counts in Bannister's indictment and he pleaded guilty to both. Each involved a violation of Section 4744(a) (2) only. There was no count based on Section 176a as there was in *Leary*. There was no opportunity for plea bargaining in the form suggested by *Liguori*, or, insofar as we can see, in any other form. As we have said, Bannister was finally sentenced to imprisonment for three years on each count, the sentences to run concurrently. Cf. note 3, *supra*. We find that there was no plea bargaining, express or implied, and we therefore need not decide what might be the law of this case if the contrary had appeared.

B. *As to the McMann Trilogy:* The Government asserts that Bannister's guilty plea is a waiver of the defense of the privilege in light of the *McMann* trilogy: McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); Parker v. North Carolina, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970); Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). We think that these cases are easily distinguishable from the instant case and we adopt the reasoning of Judge Smith in United States v. Liguori, *su-*

"The Court: They might find out that he is rich. I don't know whether Marijuana affects the brain or not, but that is why I want to send him down there, to find out what effect this constant smoking has done to him, if anything. If it hasn't done anything to him, I don't see any reason why I can't impose probation, but I will be guided by the experts.

"Mr. Freeland: Your Honor, would any study that I could bring to the Court's attention * * * There are several studies on Marijuana use and the effects thereof, which have been done in the recent past, which have been referred to in articles in the Atlantic Monthly and in Harpers to my own knowledge, and I think also in a magazine of public interest, with reference to studies done, I believe, in California and also some studies done in New York, as to the effect of Marijuana upon the user. And, the articles raise a question as to whether or not it should be in the same general category of offenses as the use of opium.

"The Court: Well, as I said before, I will have to agree with Congress unless somebody can convince them.

"Mr. Freeland: Well, Your Honor, I don't mean to present myself as an expert, but I would also respectfully present to the Court other information which might not be included in the report. It is my information from general knowledge and from my knowledge of reading that Marijuana, number one, is not addictive, and, number two, does not disturb the organic processes of the brain or the body on a long-range thing or for a long time, or for any time.

"The Court: I want the psychologists and the psychiatrists to confirm that as respects this man. If they do, I am sure they will recommend probation.

"Mr. Freeland: All right."

The foregoing constitutes the relevant portion of the transcript of the proceedings at the time of Bannister's guilty pleas.

(The effect of the language italicized in this note, *supra*, will be discussed at later points in this opinion.)

*pra,* 430 F.2d at 848–849 where the identical argument was made by the Government:

"Nor is this situation controlled by the recent decisions of the Supreme Court in McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); Parker v. North Carolina, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970); Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). In those cases the Court held that a guilty plea is not involuntary if it is based on competent contemporary advice of counsel as to admissibility of a confession or as to the validity of a possible death sentence after conviction by a jury, even if subsequent Supreme Court decisions render the confession inadmissible or the possible death sentence invalid.

"The Court in those cases relied heavily on the fact that when a petitioner pleaded guilty, he admitted in open court that he committed the charged crime. Moreover the Court felt that it would be too difficult to determine years later the magnitude of the effect of petitioner's fear of his confession or the death sentence on the petitioner's original decision to plead guilty. And the Court was apparently concerned with the burden on the states of having to permit reopening of countless guilty pleas to a variety of charges which only became open to challenge due to subsequent changes in the law.

"The instant case does not fall within those concerns. First of all, we are not considering here as in McMann v. Richardson, *supra, et al.,* whether Liguori's plea was voluntary. Liguori has not claimed that his plea was involuntary. Rather, we consider here whether Liguori when he pleaded guilty intended to waive his defense under *Leary* even before that decision was rendered. We think that he did not. See United States v. Lucia, 416 F.2d 920, 923 (5 Cir. 1969).

"Second, although Liguori admitted in open court that he violated section 4744(a), this does not, unlike in *Richardson, et al.,* establish that there is a governmental interest in his punishment. In this case, it is the statutory scheme imposing punishment for failing to incriminate oneself which violates the privilege against self-incrimination, so that even if the procedures leading to the conviction were correct the punishment here, unlike in *Richardson, et al.,* is unjustified.

"Third, there is no difficulty now in determining whether Liguori would have pleaded guilty had the *Leary* rule been in effect at the time. Since *Leary* and the privilege would have provided a complete defense to prosecution, we are not faced with an accused's decision to plead guilty based on difficult judgments as to the strength of the government's case and as to the possibility of leniency. McMann v. Richardson, *supra,* 90 S.Ct. at 1448. In this case Liguori certainly would not have pleaded guilty had he known of his right to assert the privilege as a complete defense.

"Finally, by permitting Liguori's defense founded on his privilege against self-incrimination, despite his plea of guilty, we do not jeopardize valid convictions on a wide variety of state and federal charges as was feared in McMann v. Richardson, *supra, et al.* Here we only permit the defense of privilege to be asserted by prisoners who pleaded guilty to a single federal offense, when the federal government has no valid interest in the continued punishment of those prisoners for that offense. See United States v. Miller, 406 F.2d 1100, 1104 (4 Cir. 1969)." (Footnotes omitted.)

In addition to the reasons advanced by the Second Circuit, we think that *McMann* itself anticipated the situation in the case at bar. Writing for the Court in *McMann* Mr. Justice White stated: "What is at stake in this phase of the case is not the integrity of the state convictions obtained on guilty pleas, but whether, years later, defendants must be permitted to withdraw their pleas, which

were perfectly valid when made, and be given another choice between admitting their guilt and putting the State to its proof." 397 U.S. at 773, 90 S.Ct. at 1450. In the instant case, the integrity of the conviction is precisely what is at stake for the Supreme Court has held in *Leary* that a timely and proper assertion of the privilege against self-incrimination is a complete defense to a prosecution under 26 U.S.C. § 4744(a). Furthermore, Bannister is not asking for another chance to put the Government to its proof. He admitted at trial and still admits that he committed the acts charged. He argues only that these acts were excused by the privilege against self-incrimination.

C. *As to Marchetti:*[4] Did Bannister's guilty pleas waive the Fifth Amendment defense recognized in *Leary*?[5] Can we maintain the view here that the principle of waiver cannot be asserted successfully against Bannister because the *Marchetti-Leary* defense of privilege was unrecognized at the time Bannister's pleas were entered? Can it be successfully maintained that knowledgeable counsel could or should have guessed or surmised that an assertion of the privilege against voluntary self-incrimination would have been an effective defense at the time Bannister pleaded guilty? We cannot accept such a proposition as valid for when Bannister pleaded guilty on February 28, 1967, the Supreme Court had not decided the *Marchetti* trilogy.[6] Under these circumstances, it would be particularly unfair to hold that Bannis-

ter knowingly and intelligently waived the privilege against self-incrimination. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

D. *Was the Indictment Invalid?* The Marihuana Tax Act excepts certain transactions from criminal liability including "transfers by or under prescription of a medical practitioner; legal exportation to foreign countries; transfer to government officials; and transfer of marihuana seeds to persons registered under § 4753." *Leary, supra,* 395 U.S. at 14–15 n. 10, 89 S.Ct. at 1537. It does not appear from the indictment that Bannister was in one of the exempted groups designated. Indeed, if Bannister had been a member of any such group he would have had to plead that fact by way of a defense and questions of fact would have been presented for determination. We can perceive no basis for declaring the indictment invalid on its face or invalid for any reason.

However, by pleading guilty Bannister admitted that he did unlawfully conceal and transport marihuana acquired or obtained by him without payment of the required transfer tax. So viewed it can be asserted, as we have endeavored to demonstrate, that there is a Fifth Amendment situation cast in the mold of a statute compelling self-incrimination if Bannister obeyed it.[7] Accepting the principle stated, then it can be contended further that Section 4744(a)(2) is unconstitutional as to Bannister and that Bannister's pleas were therefore corrupted thereby and must fall. Cf.

4. See note 2, *supra*.

5. The trial court, following the old and formerly well-established rule, that the pleas of guilty by Bannister waived his constitutional rights, cited Whaley v. United States, 394 F.2d 399 (10 Cir. 1968), Masterson v. United States, 293 F. Supp. 787 (D.Del.1968), and denied the motion to vacate his sentences.

6. It appears from the record (Document No. 2 in the instant proceeding) that Bannister's application for bail to the court below made reference to *Marchetti* as very pertinent to the issue of Bannister's guilt. The application was dated

March 15, 1968 and was filed, according to the docket entries, on April 10, 1968 and denied the following day, of course prior to the decision in *Leary*. But not long thereafter Bannister's counsel stipulated with the assistant district attorney that the decision in the instant proceeding should be delayed until the Supreme Court had decided *Leary* (Document No. 10 in the instant proceeding).

7. Cf. Mackey v. United States, 411 F.2d 504 (7 Cir. 1969), affirmed, 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971).

Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). If the foregoing conclusion be correct, it furnishes another reason for the disposition of Bannister's Section 2255 proceeding in his favor. As appears hereinafter, however, we do not rest our decision on this theory.

## II.

We return now to what we described as one of the principal issues on this appeal, i. e., whether the *Leary* doctrine is here applicable, putting to one side the issue of retroactivity. What is the correct interpretation of the phrase used by the Supreme Court, "timely and proper assertion of the [Fifth Amendment] privilege" against compulsory self-incrimination?

*First,* when the Supreme Court used the word "proper" we think it meant no more than to designate as proper an acceptable procedure authorized by law to raise a pertinent and relevant issue. Certainly the assertion of a Fifth Amendment privilege here falls within such a category, and we can perceive no reason why Section 2255 does not supply an apt and proper approach to the serious constitutional problems presented by the case at bar. We think we need say no more as to the issue of propriety.

*Second,* the word "timely," [8] used to modify the phrase "assertion of the privilege" must mean the assertion of a proper defense at an appropriate time. The question of timeliness is, under the circumstances at bar, related to the question of allowing collateral attack. That collateral attack upon a judgment is permissible by Section 2255 seems unquestioned since Mr. Justice Brennan's decision in Kaufman v. United States, 394 U.S. 217, 221, 89 S.Ct. 1068, 1071, 22 L.Ed.2d 227 (1969), where it is stated:

> "Section 2255 revised the procedure by which federal prisoners are to seek such relief but did not in any respect

cut back the scope of the writ. The section was included in the 1948 revision of the Judicial Code 'at the instance of the Judicial Conference [of the United States] to meet practical difficulties that had arisen in administering the habeas corpus jurisdiction of the federal courts. Nowhere in the history of Section 2255 do we find any purpose to impinge upon prisoners' rights of collateral attack upon their convictions. On the contrary, the sole purpose was to minimize the difficulties encountered in habeas corpus hearings *by affording the same rights in another and more convenient forum,'* United States v. Hayman, 342 U.S. 205, 219 [72 S.Ct. 263, 272, 96 L.Ed. 232] (1952) (italics supplied); 'the legislation was intended simply to provide in the sentencing court a remedy exactly commensurate with that which had previously been available by habeas corpus in the court of the district where the prisoner was confined.' Hill v. United States, 368 U.S. 424, 427 [82 S.Ct. 468, 7 L.Ed.2d 417] (1962). Thus, we may refer to our decisions respecting the availability of the federal habeas remedy in deciding the question presented in this case." (Footnote omitted.)

See Fay v. Noia, 372 U.S. 391, 409, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); cf. Eby v. United States, 286 F.Supp. 387, 389 (N.D.Okl.1968), affirmed, 415 F.2d 319 (10 Cir. 1969). There of course can be no external friction in a collateral attack in a case such as this for the courts involved are federal tribunals and neither this court nor the court below need refrain from granting Bannister relief on the ground that such an action might disturb the delicate equilibrium, the comity, which should be maintained between federal and state courts.

As to the timeliness of Bannister's Section 2255 proceeding, we point out that the second paragraph of Section 2255 provides that a motion for relief under

---

8. Although Bannister's sentences expired on February 28, 1970, his cause is not moot. See Carafas v. LaVallee, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968).

the section "may be made at any time." It follows, we think, that if collateral attack be permissible and we have held *ante* that such is the case, the present proceeding must be held to be "timely."

### III.

### *Retroactivity*

We come now to the issue of retroactivity. The law on this point is far from clear. Compare Santos v. United States, 417 F.2d 340 (7 Cir. 1969), vacated on other grounds, 397 U.S. 46, 90 S.Ct. 811, 25 L.Ed.2d 36 (1970) holding the principle of *Leary* retroactive,[9] with Rivera-Vargas v. United States, 307 F. Supp. 1075 (D.Puerto Rico 1969), holding *Leary's* effect to be prospective.[10, 11] For reasons which follow, we agree with the Seventh Circuit's conclusion in *Santos* and hold that *Leary* is fully retroactive.

The three-pronged test, as formulated by the Supreme Court, for determining whether a given decision shall be accorded retroactive application involves analyses of: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." Stovall v. Denno, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967).

Of these three factors, primary weight is to be given the "purpose" of the new standards, Desist v. United States, 394 U. S. 244, 249, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), and in terms of "purpose" there are two broad categories of cases. One broad category contains those decisions designed to deter unconstitutional state action, as for example the exclusionary rule created to protect the Fourth Amendment's guarantee of freedom from unreasonable search and seizure. As deterrence is possible only with respect to future acts, it has been reasoned that the purpose of such a deterrent rule is served by prospective appli-

---

9. See also Rowell v. United States, 415 F. 2d 300 (8 Cir. 1969) (holding *Leary* retroactive), remanded on other grounds, 397 U.S. 662, 90 S.Ct. 1407, 25 L.Ed. 2d 642 (1970); Miller v. United States, 311 F.Supp. 705 (N.D.Ohio 1970) (holding *Leary* retroactive); United States v. King, 307 F.Supp. 217 (S.D.Cal.1969) (dictum that *Leary* is retroactive), aff'd, 430 F.2d 1177 (9 Cir. 1970), cert. denied, 401 U.S. 962, 91 S.Ct. 972, 28 L.Ed.2d 247 (1971); In re Johnson, 3 Cal.3d 404, 90 Cal.Rptr. 569, 475 P.2d 841 (1970) (holding *Leary* retroactive).

10. See also Ramseur v. United States, 425 F.2d 413 (6 Cir. 1970) (holding that *Leary* should be applied "largely prospectively"); United States v. Scardino, 414 F.2d 925 (5 Cir. 1969) (assuming that *Leary* is not retroactive, nevertheless it was held that *Leary* applied to *Scardino* since his conviction was not final); Barrett v. United States, 300 F.Supp. 1060 (D.Minn.1969) (holding *Leary* not retroactive).

11. There is, however, a body of analogous precedents which we deem to be of value in our decision here. In the decisions of Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); Grosso v. United States, 390 U.S. 62, 88

S.Ct. 709, 19 L.Ed.2d 906 (1968), and Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968) (the *Marchetti Trilogy*), the Supreme Court held the Fifth Amendment to be a defense to federal gambling (*Grosso* and *Marchetti*) and firearms (*Haynes*) statutes which required incriminatory registration. The statutory provisions involved are operatively similar to those involved in *Leary*. Indeed, the Court's decision in *Leary* was directly based upon these prior cases. On the question of the retroactivity of *Marchetti* and its companion cases, there has developed a split of authority. See Graham v. United States, 407 F.2d 1313 (6 Cir. 1969), vacated and remanded, 402 U.S. 938, 91 S.Ct. 1623, 29 L.Ed.2d 107 (1971) and Horton v. United States, 300 F.Supp. 1332 (D.Conn.1969), denying retroactive application to final convictions. Compare United States v. Miller, 406 F.2d 1100 (4 Cir. 1969); United States v. Lucia, 416 F.2d 920 (5 Cir. 1969), rehearing en banc, 423 F.2d 697 (1970), cert. denied 402 U.S. 943, 91 S.Ct. 1607, 29 L.Ed.2d 111 (1971), Meadows v. United States, 420 F.2d 795 (9 Cir. 1969) cert. denied, 402 U.S. 948, 91 S.Ct. 1607, 29 L.Ed.2d 118 (1971) and Isaac v. United States, 293 F.Supp. 1096 (D.S.C. 1968), granting full retroactivity.

cation. See, e. g., Linkletter v. Walker, 381 U.S. 618, 637, 85 S.Ct. 1731, 14 L. Ed.2d 601 (1965), holding Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), not retroactive, and Desist v. United States, *supra*, 394 U.S. at 249–250, 89 S.Ct. 1030, restricting to prospective effect the rule of Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In the other broad category are those cases announcing new rules "fashioned to correct serious flaws in the fact-finding process at trial," [12] or to guard "the very integrity of the fact-finding process." [13] Thus, for example, cases expanding the criminal defendant's constitutional right to confront adverse witnesses, Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), were held retroactive in Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968), and Berger v. California, 393 U.S. 314, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969), respectively. Similarly, full retroactive application has been repeatedly given to cases expounding new rules as to the right to counsel

at various critical stages of a criminal prosecution. [14]

*Leary* is best categorized in this latter group of cases designed to protect the "integrity of the fact-finding process." As we have said, the Supreme Court reasoned that compliance with the Marihuana Tax Act would have exposed Leary to a " 'real and appreciable' risk of self-incrimination" and that his noncompliance was therefore constitutionally protected by the Fifth Amendment. Thus the "purpose" of the *Leary* decision was to compel the vacating of a conviction, where that very conviction impinged upon the privilege against self-incrimination. *Leary* had nothing to do with the "fact-finding" process. There was no suggestion that his conviction was not founded upon sufficient, reliable evidence. However, the Supreme Court's repeated express concern with the "integrity of the fact-finding process" is but one, albeit a common, manifestation of its larger concern with fairness generally, [15] and it is as unfair to convict an individual for constitutionally protected conduct as it is to convict him through an unreliable process for the commission

12. Stovall v. Denno, *supra*, 388 U.S. at 298, 87 S.Ct. at 1970.

13. Linkletter v. Walker, *supra*, 381 U.S. at 639, 85 S.Ct. at 1743.

14. See Doughty v. Maxwell, 376 U.S. 202, 84 S.Ct. 702, 11 L.Ed.2d 650 (1964), holding retroactive Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (right to counsel at trial for serious crimes); Smith v. Crouse, 378 U.S. 584, 84 S.Ct. 1929, 12 L.Ed.2d 1039 (1964), holding retroactive Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (right to counsel on appeal); McConnell v. Rhay, 393 U.S. 2, 89 S.Ct. 32, 21 L.Ed.2d 2 (1968), holding retroactive Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967) (right to counsel at sentencing); and Arsenault v. Massachusetts, 393 U.S. 5, 89 S.Ct. 35, 21 L.Ed.2d 5 (1968), holding retroactive White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963) (right to counsel at certain preliminary hearings).

15. That the Supreme Court's concern with the "integrity of the fact-finding process" is merely one species of a larger concern with fairness generally is amply borne out by its decision in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776 (1968), holding unconstitutional a state's exclusion from murder trials of prospective jurors conscientiously opposed to capital punishment. The Court refused to accept petitioner's contention that the exclusion of anti-death penalty jurors had any bearing on the fact-finding process as it pertained to guilt determination or that it materially increased the risk of conviction. Id. at 517–518, 88 S.Ct. 1770. Nevertheless, the Court declared that its decision was intended to be fully retroactive. *Id.* at 523, n. 22, 88 S.Ct. 1770. See also United States v. Miller, 406 F.2d 1100, 1103 (4 Cir. 1969): "The Court's emphasis in its retroactivity decisions on the importance of reliable fact-finding procedures is simply one frequently articulated aspect of its concern that all convictions, past and present, shall be the product of fundamentally fair proceedings."

of an act which Congress has the power to make criminal.[16, 17] Retroactivity is indicated for a decision designed to obviate a "clear danger of convicting the innocent," Tehan v. United States ex rel. Shott, 382 U.S. 406, 416, 86 S.Ct. 459, 465, 15 L.Ed.2d 453 (1966), and the convictions of Leary and Bannister were in a sense convictions of "the innocent." Accordingly, consideration of the "purpose" criterion suggests full retroactivity for *Leary*.

The other two criteria pertinent to the retroactivity issue, justifiable state reliance upon the prior decisional law and the potential adverse impact upon the administration of justice, do point somewhat to a prospective limitation of *Leary*. At least prior to the *Marchetti* trilogy, note 2 *supra*, there was little reason to suspect that any provision of the Marihuana Tax Act might be constitutionally infirm. But as we recently stated in United States ex rel. Allison v. New Jersey, 418 F.2d 332, 340 (3 Cir. 1969), cert. denied, 400 U.S. 850, 91

S.Ct. 68, 27 L.Ed.2d 88 (1970), "[r]eliance has been the least important of the three factors and has been only vaguely defined." It is also certain that retroactive application of *Leary* will cause some disruption upon the administration of justice. However, "[a]s any truly new rule obviously will have some adverse impact * * * this factor has been of significance sufficient to overcome the dictates of the purpose test only when the burden would be of considerable magnitude." *Allison, supra*, at 340. In this regard we do not believe that retroactive application of *Leary* will impose a severe burden. Our holding will undoubtedly result in freeing a number of persons heretofore convicted for violation of the Marihuana Tax Act. On the other hand, as the Fifth Amendment is a complete defense to prosecution under Section 4744(a) (2), there will be no need for protracted evidentiary hearings upon applications for post-conviction relief.[18]

In sum, the interests of state reliance and the administration of justice do not

---

16. Or as put by Judge Wright in Meadows v. United States, 420 F.2d 795, 799 (9 Cir. 1969), in a decision holding retroactive Haynes v. United States, note 2, *supra*: "The 'integrity of the * * * process' by which appellant was tried and sentenced is no less impugned by his conviction for an offense that the United States has no power to punish than by his conviction for an offense he did not commit. In both situations the defect in the conviction, unlike that involved when illegally seized evidence is admitted or even when an improperly procured confession is received, goes to the very center of the legal justification for the punishment imposed. To be valid, a punishment following upon the determination that a certain set of facts exists must necessarily presuppose that that set of facts constitutes an offence, *see* H. L. A. Hart, Punishment and Responsibility 5."

17. By suggesting that Congress has no power to proscribe Leary's conduct we are referring *only* to his failure to comply with the incriminatory aspects of the Marihuana Tax Act and not to his dealings in marihuana. We adopt here the statement of the Court in *Leary* itself that "nothing in what we hold today implies any constitutional disability in Congress

to deal with the marihuana traffic by other means." 395 U.S. at 54, 89 S.Ct. at 1557.

18. Cf. Stovall v. Denno, supra, 388 U.S. at 300, 87 S.Ct. at 1971: "At the very least, the processing of current criminal calendars would be disrupted while hearings were conducted to determine taint, if any, in identification evidence, and whether in any event the admission of the evidence was harmless error." This sort of rationale is irrelevant in the *Leary* situation.

Of course, the Supreme Court's occasional reliance upon the factor of adverse impact upon the administration of justice stemming from retroactivity manifests another concern, to wit, a wholesome desire not to require the wholesale release of large numbers of convicted criminals. See, e. g., Tehan v. United States ex rel. Shott, 382 U.S. 406, 418–419, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966). But this consideration has no real bearing on the, issue of *Leary's* retroactivity. In most instances the release of a convicted criminal means the release of one who has committed socially dangerous or undesirable acts. Thus for example the retroactive application of *Miranda* would have required the release of murderers, rapists,

in the instant case outweigh the "purpose" test's indication that *Leary* ought to be fully retroactive.

On two occasions the Supreme Court has limited to prospective application new rules intended to effectuate the privilege against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), set new standards for police custodial interrogation, and Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), forbade prosecutorial comment upon an accused's failure to testify. Both of these decisions were accorded only prospective effect in Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), and in Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), respectively. The argument has been made that in light of these two cases, prospectivity is warranted for any self-incrimination case. Cf. Williams v. United States, 291 F.Supp. 376, 379–380 (D. Minn.1968). Such an argument, however, overlooks the significant caveat in *Johnson, supra,* 384 U.S. at 728, 86 S.Ct. at 1778, that "the retroactivity or nonretroactivity of a rule is not automatically determined by the provision of the Constitution on which the dictate is based." We are thus admonished to conduct a careful analysis of the pertinent considerations in each case, and in making such an analysis here it becomes apparent that *Johnson* and *Tehan* are distinguishable.

The Court in *Johnson* carefully emphasized that even though *Miranda* was prospective, there would remain "other safeguards * * * available to protect the integrity of the truth-determining process at trial." Specifically, those convicted prior to *Miranda* and in violation of its standards could still contest their convictions by showing that their custo-dial admissions were involuntary, 384 U. S. at 729–730, 86 S.Ct. at 1779. And in *Tehan,* it was noted that the practice of adverse prosecutorial comment upon a defendant's failure to testify merely " '[cut] down on the privilege by making its assertion costly.' " 382 U.S. at 414, 86 S.Ct. at 464 citing Griffin v. California, 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Conversely, in the instant case, Bannister's very conviction violated the Fifth Amendment. If *Leary* be held prospective, there would be no alternative safeguards to alleviate the unfairness of his conviction.

*Johnson* and *Tehan* are further distinguishable in terms of the criterion of the administration of justice. In *Tehan* the Court noted that "it may fairly be assumed that there has been comment in every single trial in the courts of California, Connecticut, Iowa, New Jersey, New Mexico, and Ohio, in which the defendant did not take the witness stand * * *." 382 U.S. at 418, 86 S.Ct. at 466. And in *Johnson* it was reported that "[p]rior to *Escobedo* and *Miranda,* few States were under any enforced compulsion on account of local law to grant requests for the assistance of counsel or to advise accused persons of their privilege against self-incrimination." 384 U.S. at 731, 86 S.Ct. at 1780. Given his historical fact, if *Miranda* had not been limited to prospective effect, countless convictions would have been tainted. We believe that applying the *Leary* doctrine retroactively will not impose such a severe burden.[19]

Two recent Supreme Court decisions seem to confirm our position. These are United States v. United States Coin and Currency, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971) and Mackey v. United States, *Id.* at 667, 91 S.Ct. at 1164. In *Coin and Currency* the United States had brought an action for the forfeiture

---

burglars, etc. But the only reason why Leary was convicted and sentenced was that he had refused to incriminate himself by complying with the Marihuana Tax Act, and it is a *constitutional postulate of our system* that refusal to incrim-inate one's self is not a socially undesirable act.

19. For a similar analysis of *Johnson* and *Tehan* in a similar context, see United States v. Miller, 406 F.2d at 1103–1104.

of money in the possession of a gambler, Angelini, when he was arrested for failing to register as a gambler and to pay the tax as a gambler. 26 U.S.C. §§ 4411, 4412 and 4901. The District Court found that the money had been used in violation of the statutes referred to and ordered forfeiture pursuant to 26 U.S.C. § 7302. The Court of Appeals affirmed (379 F.2d 946 (7 Cir. 1967)) and the Supreme Court remanded the case for further consideration in the light of the Supreme Court's subsequent decisions in *Marchetti* and *Grosso* (390 U.S. 204, 88 S.Ct. 899, 19 L.Ed.2d 1035 (1968)), decisions which held that gamblers had a Fifth Amendment right to remain silent despite the statutory requirement that they submit reports which could incriminate them. The Court of Appeals for the Seventh Circuit ordered the money returned (393 F.2d 499 (1968)) and certiorari was then granted by the Supreme Court. 393 U.S. 949, 89 S.Ct. 375, 21 L.Ed.2d 361 (1968). The Supreme Court, after determining that the Fifth Amendment privilege against self-incrimination may properly be invoked in this proceeding since the forfeiture statutes when viewed in their entirety are intended to penalize only persons significantly involved in a criminal enterprise, went on to state that the *Marchetti-Grosso* rule would have retroactive effect:

"Unlike some of our earlier retroactivity decisions, we are not here concerned with the implementation of a procedural rule which does not undermine the basic accuracy of the factfinding process at trial. Linkletter v. Walker, 381 U.S. 618 [85 S.Ct. 1731, 14 L.Ed.2d 601] (1965); Tehan v. [United States ex rel.] Shott, 382 U.S. 406 [86 S.Ct. 459, 15 L.Ed.2d 453] (1966); Johnson v. New Jersey, 384 U.S. 719 [86 S.Ct. 1772, 16 L.Ed.2d 882] (1966); Stovall v. Denno, 388 U.S. 293 [87 S.Ct. 1967, 18 L.Ed.2d 1199] (1967). Rather *Marchetti* and *Grosso* dealt with the kind of conduct that cannot constitutionally be punished in the first instance. These cases held that gamblers in Angelini's posi-

tion had the Fifth Amendment right to remain silent in the face of the statute's command that they submit reports which could incriminate them. In the absence of a waiver of that right, such persons could not properly be prosecuted at all.

"Given the aim of the *Marchetti-Grosso* rule, it seems clear that the Government must be required to undergo the relatively insignificant inconvenience involved in defending any lawsuits that may be anticipated. Indeed, this conclusion follows *a fortiori* from those decisions mandating the retroactive application of those new rules which substantially improve the accuracy of the factfinding process at trial. In those cases, retroactivity was held required because the failure to employ such rules at trial meant there was a significant chance that innocent men had been wrongfully punished in the past. In the case before us, however, even the use of impeccable factfinding procedures could not legitimate a verdict decreeing forfeiture, for we have held that the conduct being penalized is constitutionally immune from punishment. No circumstances call more for the invocation of a rule of complete retroactivity." (Footnotes omitted.)

If *Marchetti-Grosso* be applied retroactively in a forfeiture case it would seem that *a fortiori* the rule would be applicable in a criminal case such as that at bar.

That our position interpreting Mr. Justice Harlan's majority opinion in *Coin and Currency* is correct is, we think, fortified by the first paragraph of Mr. Justice Brennan's concurring opinion in which he states:

"I join the opinion of the Court. The dissent would have us hold that the Government may continue indefinitely to enforce criminal penalties against individuals who had the temerity to engage in conduct protected by the Bill of Rights before the day that this Court held the conduct protected. Any such holding would have no more

support in reason than it does in our cases."

Mr. Justice Brennan went on to strongly disapprove the reasoning of the dissenting Justices. Mr. Justice Brennan went on to say *Id., supra,* at 726, at 1047 of 91 S.Ct.:

"[W]hen a new procedural rule has cast no substantial doubt upon the reliability of determinations of guilt in criminal cases, we have denied the rule retroactive effect where a contrary decision would 'impose a substantial burden [of retrials] upon the * * * judicial system * * * while serving neither to redress knowing violations of [constitutional rights] nor to protect a class of persons the government has no legitimate interest in punishing.' Williams v. United States, ante [401 U.S.], at 653 [91 S.Ct. 1148, at 1152, 28 L.Ed.2d 388] (Brennan, J., concurring); see Desist v. United States, 394 U.S. 244 [89 S.Ct. 1030, 22 L.Ed.2d 248] (1969). But since the government has no legitimate interest in punishing those innocent of wrongdoing, cf. Thompson v. Louisville, 362 U.S. 199 [80 S.Ct. 624, 4 L.Ed.2d 654] (1960), when a new procedural rule casts doubt upon the reliability of a substantial proportion of past convictions obtained without its protections, we have required the new rule be given full retroactive effect. Williams v. United States, ante [401 U.S.], at 653 [91 S.Ct., at 1152]. From this it follows *a fortiori* that a decision holding certain conduct beyond the power of government to sanction or prohibit must be applied to prevent the continuing imposition of sanctions for conduct engaged in before the date of that decision. For the decision does far more than cast doubt upon the reliability of the guilt-determining process. It makes the question of reliability irrelevant, for it establishes beyond peradventure that the government has no legitimate interest in punishing such conduct at all. See Ex parte Siebold, 100 U.S. 371, 376–377 [25 L.Ed. 717] (1880). Accordingly, it may no longer continue to punish it."

In Mackey v. United States the petitioner was tried for income tax evasion. During this trial the Government used monthly wagering tax forms that Mackey had filed pursuant to statute to show that the gross amount of wagers he reported less business expenses exceeded the gambling profits reported on his income tax returns. Mackey objected to the introduction of this evidence on the ground that the forms were prejudicial and irrelevant but he was convicted in 1964 and the Court of Appeals affirmed. 345 F.2d 499 (7 Cir. 1965). After the Supreme Court's decisions in *Marchetti* and *Grosso* Mackey made a motion to vacate under section 2255 on the ground that the Fifth Amendment privilege against self-incrimination barred the prosecution's use of the wagering tax forms. After the District Court denied this application the Court of Appeals affirmed, holding that *Marchetti* and *Grosso* would not be applied retroactively to overturn the earlier income tax conviction based on the then applicable constitutional principles. 411 F.2d 504 (7 Cir. 1969). The Supreme Court affirmed the conviction, holding that *Marchetti* and *Grosso* are not to be applied retroactively in a trial for income tax evasion since there was no threat to the reliability of the factfinding process in using the wagering tax forms as evidence at Mackey's trial. Mr. Justice Harlan, in a concurring opinion, after tracing the history of the writ of habeas corpus, concluded that a section 2255 procedure should not be used to retroactively apply a new "procedural due process" rule. He went on to delineate an exception, however, which is applicable to cases such as *Bannister.*

"Although not necessary to the resolution of either of the two collateral cases now here, for sake of completeness I venture to add that I would make two exceptions to this general principle. First, the above discussion is written only with new "procedural due process" rules in mind, that is those applications of the Constitution

that forbid the Government from utilizing certain techniques or processes in enforcing concededly valid societal proscriptions on individual behavior. New "substantive due process" rules, that is, those that place, as a matter of constitutional interpretation, certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe, must, in my view, be placed on a different footing. As I noted above, the writ has historically been available for attacking convictions on such grounds. This, I believe, is because it represents the clearest instance where finality interests should yield. There is little societal interest in permitting the criminal process to rest at a point where it ought properly never to repose. Moreover, issuance of the writ on substantive due process grounds entails none of the adverse collateral consequences of retrial I have described above. Thus, the obvious interest in freeing individuals from punishment for conduct that is constitutionally protected seems to me sufficiently substantial to justify applying current notions of substantive due process to petitions for habeas corpus. See generally Part II of my opinion for the Court in United States v. United States Coin and Currency, 401 U.S. 715, at 722 [91 S.Ct. 1041, at 1045–1046, 28 L.Ed.2d 434] (1971)." (Footnotes omitted.)

We conclude that *Bannister* comes within the exception set forth by Mr. Justice Harlan.

### IV.

#### *Disposition*

We refer again to the colloquy between the court, counsel for Bannister, Bannister himself, and the assistant district attorney set out in note 3 and in particular to *"the constitutional question"* (emphasis added), language used by Bannister's counsel in the original proceeding. The United States asserts that the colloquy and the reference to *"the constitutional question"* demonstrates that Bannister had knowledge of a defense based on the claim of privilege against compulsory self-incrimination and that knowing of it, he therefore waived it. Bannister's counsel before this court asserts that the colloquy is entirely consistent with his assertion that Bannister did not knowingly and intelligently waive that privilege. He argues that the statement by Bannister's counsel at sentencing shows nothing more than that consideration was given to the assertion of a defense based on the privilege and that such a procedure was rejected by Bannister's trial counsel in light of the then prevailing law. We cannot hold that in asserting waiver by Bannister the Government has met "[t]he classic definition of waiver enunciated in Johnson v. Zerbst, 304 U.S. 458, 464 [58 S.Ct. 1019, 1023, 82 L.Ed. 1461] —— 'an intentional relinquishment or abandonment of a known right or privilege * * * '." Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 849, 9 L.Ed.2d 837 (1963). We can scarcely say under the circumstances, even assuming that Mr. Freeland, Bannister's lawyer, had the Fifth Amendment privilege in mind, that there was an "intentional" waiver of a "known" right. We are therefore required to vacate the judgments of conviction and remand the case to the District Court with the direction to dismiss it. See United States v. United States Coin & Currency, *supra*, and the quotations therefrom.

GIBBONS, Circuit Judge, with whom SEITZ, Chief Judge, concurs.

In this collateral attack on a judgment of conviction after a guilty plea the petitioner asserts that his prosecution under 26 U.S.C. § 4744(a)(2) was impermissible because the privilege against self-incrimination afforded an absolute defense. That defense did not exist until it was created by the decision of the Supreme Court in Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), a decision made long after Bannister's guilty plea. The result in *Leary* was foreshadowed but not decided, by the de-

cisions in Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), and Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968). Bannister's case is rendered difficult because neither in *Leary* nor in *Marchetti, Grosso* or *Haynes* did the Supreme Court say squarely that statutes requiring conduct which for an individual would be self-incriminating were unconstitutional per se. Rather the Court stated that a person charged under the statutes would have an absolute defense to the charge if he asserted his privilege against self-incrimination. The Court may well have adopted this approach, which saved the statutes in certain cases where compliance would not involve individual self-incrimination, as an accommodation between the taxing power of Congress and the fifth amendment rights of individuals subject to such taxation. See Marchetti v. United States, *supra*, 390 U.S. at 58, 61, 88 S.Ct. 697. This left open the question whether the defense of the privilege against self-incrimination like the privilege itself, could be waived. Judge Biggs' opinion turns the availability of collateral relief from a judgment of conviction on the retrospective determination of the presence or absence of a waiver of the defense. In Bannister's case, which involves a guilty plea, he finds that the defense was in some manner asserted, and hence not waived. Apparently in another case he would find the defense waived because of some action or inaction on the part of the defendant. Bannister's guilty plea took place before the decision in *Leary*. Realistically neither he nor any other defendant can be deemed to have waived an absolute defense which the Supreme Court had not yet created.

We believe that the fair administration of justice demands that *Leary* be applied in a similar manner to those cases in which the statute creating the crime has been declared unconstitutional rather than to those cases creating new procedural rules for the criminal justice process.

Bannister's case presents a collateral attack on the ground of a subsequent change in the law upon a judgment entered after a guilty plea. One approach which would deny relief would be to turn the result on the nonretroactivity of *Leary*. That approach is foreclosed by the analysis of the Supreme Court in Mackey v. United States, 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971), and United States v. United States Coin and Currency, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971), which hold that the *Marchetti* and *Grosso* cases should be applied retroactively.

Judge Hastie quite properly concludes that the cases of Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), and Parker v. North Carolina, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970) have greatly narrowed the area of collateral attack upon a criminal conviction when the accused has pleaded guilty. He would on this ground deny relief to Bannister.

We do not agree that the inquiry can stop with the *Brady, McMann* and *Parker* cases. Those cases do seem to have rejected, in guilty plea cases, the waiver test for availability of collateral attack announced in Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). We do not quarrel with the proposition that every change in the procedural law governing the criminal justice system cannot be the means for casting wholesale doubt upon the vast bulk of criminal judgments which result from guilty pleas. But the *Brady, McMann* and *Parker* cases involved changes in the law which were essentially procedural. They did not involve petitioners confined as a result of a guilty plea to an offense under a statute later held to be unconstitutional as applied to them and their conduct. Under these cases, a guilty plea, if voluntarily made, may well be viewed as a conclusive admission of the acts charged in the indictment. It hardly fol-

lows, however, that incarceration should continue if the acts themselves are "constitutionally immune from punishment." United States v. United States Coin and Currency, *supra*, 401 U.S. at 715, 91 S. Ct. 1041. Bannister's case presents this distinguishable situation. His guilty plea case, and similar cases arising by virtue of statutes later held to be unconstitutional may present various factual patterns. The petitioner may be a defendant who chose, at the time of his guilty plea, to remain unrepresented, but who received the minimum notice required by McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), and Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). He may be a defendant who was represented by an attorney who was not so astute as to anticipate the decisions in *Marchetti, Grosso, Haynes, Leary* or whatever case subsequently holds the statute unconstitutional as to the defendant's conduct. He may be a represented defendant who, although his astute attorney anticipated that the statute might be constitutionally defective and so advised him, nevertheless entered a guilty plea. Finally, in any one of the three situations the guilty plea may have resulted from a plea bargain in which the defendant pleaded guilty to a downgraded offense.

The waiver approach as outlined in Judge Biggs' opinion would draw the line between the defendant represented by the lawyer with foresight and the defendant represented by the less astute lawyer. What should the result be if we suppose, hypothetically, that the defendant represented by the less astute lawyer was a party to a plea bargain? Such a hypothesis is not farfetched in the field of drug enforcement. Should the existence of some sort of consideration for a bargained for disposition be taken into account?

Rather than looking for a nonexistent personal participatory waiver in cases such as this, our starting point should be a determination of the judicial and public interests presented by the petition.

Our first interest is our abhorrence, from the standpoint of due process, of the continuing incarceration of a defendant for violation of a statute which could not constitutionally make criminal the conduct which he admitted. The statute "deal[s] with the kind of conduct that cannot constitutionally be punished in the first instance." United States v. United States Coin and Currency, *supra*, 401 U.S. at 715, 91 S.Ct. at 1046. A competing interest is the imperative necessity, if the criminal justice system is to function, to insulate guilty plea judgments from collateral attack following every change in the law. In deciding between these competing interests a quest for a nonexistent waiver (or more precisely the statement of a conclusion in terms of waiver) is not helpful. In each of the hypothetical guilty plea cases outlined above both interests compete.

A fairly compelling argument can be made in favor of making a defendant live up to his plea bargain even when it results in his incarceration for conduct which could not constitutionally be made criminal. Accepting the now recognized policy of legitimizing plea bargains, North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1969), such a result would not shock us. On the other hand the government and the judicial process both obtain substantial benefits from the plea bargain process. In view of those substantial benefits it is entirely reasonable that the government bear the risk that a statute to which it accepts a plea may later be held to be unconstitutional as applied to the defendant's conduct. Weighing the competing considerations we conclude that the government should bear this risk.

We would reach this result not by the elusive pursuit of a phantom waiver, but by a much older notion, that a judicial proceeding under an unconstitutional

statute is, for federal habeas corpus purposes, void. Ex parte Siebold, 100 U.S. 371, 375, 25 L.Ed. 717 (1879). Neither Fay v. Noia, *supra,* nor the cases since that decision preclude resort to the older habeas corpus jurisdictional assumptions in opening rather than closing the door. This approach requires that Bannister be given relief from his conviction. We therefore concur in the result.

HASTIE, Circuit Judge (dissenting).

The 1970 decisions of the Supreme Court in Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747; McMann v. Richardson, 397 U.S. 759, 90 S. Ct. 1441, 25 L.Ed.2d 763, and Parker v. North Carolina, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785, teach that the normal area of permissible collateral attack upon a criminal conviction is greatly narrowed when the case is one in which the accused has pleaded guilty. I read those cases as holding that if a guilty plea has been a voluntary act and has been entered with comprehension of the then existing relevant circumstances, it is invulnerable to collateral attack, even on constitutional grounds. Thus, in my view, the decisive question here is whether the plea in this case, unquestionably voluntary, was made knowingly and with comprehension within the meaning of the above cited decisions.

At the time of the guilty plea, neither the accused nor his counsel could anticipate that in a future case [1] the Supreme Court would decide, contrary to professional understanding before that ruling, that one could successfully defend a criminal charge of transporting marijuana without the required transfer tax having been paid, by asserting that he could not have paid the tax without self-incrimination. Neither could it be anticipated that any such ruling would be given retrospective effect.[2]

Because the accused could not prophetically anticipate this future sequence of legal rulings, this court now holds that his guilty plea was not entered with knowledge and comprehension of relevant circumstances. It is with this restrictive interpretation of the invulnerability of guilty pleas as announced in the *Brady, McMann* and *Parker* cases that I disagree.

I think it is inadequate knowledge and comprehension of the situation at the time of pleading, and that alone, that now permits a guilty plea to be attacked collaterally. In the *Brady* opinion, the Supreme Court rationalized its decision by saying that "a voluntary plea of guilty intelligently made in the light of the *then applicable* law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise." 397 U.S. at 757, 90 S.Ct. at 1473 (italics added). That language, used in a case where a plea was entered without anticipation of a future constitutional holding that would have removed the impelling reason for the plea, seems to cover the circumstances of the present case. I think we are bound by it, though we may wish that the rule were otherwise.

For this reason, I dissent.

ALDISERT, Circuit Judge, joins in this dissenting opinion.

---

1. Leary v. United States, 1969, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57.

2. The majority opinion candidly characterizes the question whether *Leary* should be given retrospective application as "far from clear" even now.